**UNITED STATES of America, Plaintiff–Appellee,**

v.

**James E. SCHULTZ, Defendant–Appellant.**

**No. 93–3051.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 14, 1993.

Decided Jan. 20, 1994.

---

William E. Hunt (argued and briefed), Office of the U.S. Attorney, Cincinnati, OH, for plaintiff-appellee.

Thomas W. Miller, W. Kelly Johnson (argued and briefed), Miller & Rosewald, Cincinnati, OH, for defendant-appellant.

Before: MERRITT, Chief Judge; JONES, Circuit Judge; and CELEBREZZE, Senior Circuit Judge.

MERRITT, Chief Judge.

James Schultz appeals his conviction and sentencing for possession of hashish with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). Schultz seeks to

overturn his conviction on the ground that the two search warrants which produced the evidence used to convict him were issued without probable cause. Failing that, he seeks to have his sentence reduced on the grounds that (1) the trial court inappropriately assigned him a two-point enhancement for being a "leader" or "organizer," and (2) the trial court inappropriately increased his Criminal History Category from III to VI by using two out-of-time convictions to characterize him as a career offender.

We affirm Schultz's conviction but vacate his sentence and remand the case to the district court for resentencing.

## I. The Search Warrant Issue

On January 6, 1992, Detective Rick Ideker of the Delhi Township (Ohio) Police Department arrested David Koerner for possession of controlled substances. Koerner told Ideker that his supplier was Andrew Hoernschmeyer and that the local source of the controlled substances had Jamaican connections. On January 17, 1992, Ideker arrested Hoernschmeyer, who told Ideker that he had purchased controlled substances from John Reid. The next day, Ideker arrested Reid, who told Ideker that he had purchased illegal drugs from James Leek and that it was his understanding that Leek's supplier owned an ice cream business around the corner from Leek's residence. On January 23, 1992, Ideker arrested Leek, who told Ideker that his local source was Schultz. This was Ideker's first evidence directly concerning Schultz. None of the above individuals had previously been used as police informants.

Ideker investigated Schultz, who did in fact own the ice cream business Reid had mentioned. Ideker found that Schultz had prior convictions for possession of marijuana products and that Florida police had observed Schultz in Fort Myers, Florida. Leek gave Ideker a phone number he had used to order illegal drugs, and Ideker learned that the number was listed to a woman in whose car Schultz had once been issued a traffic citation.

Ideker obtained, by court order, phone records of the telephone number Leek had provided. Four calls had been made from it to the Fort Myers area, and three calls had been made to it from Jamaica. The number was registered to Apartment 509 at 707 W. Martin Luther King Drive in Cincinnati, Ohio. Police found that automobiles registered to Schultz were parked in that complex, but they never observed Schultz on the premises or observed any illegal activities there, prior to obtaining the first search warrant. Leek also told Ideker that he had never been to Apt. 509 and had never purchased controlled substances from that address.

By means of a credit check, Ideker learned that Schultz maintained safe deposit boxes at the Ludlow Street branch of Star Bank in Cincinnati. Through a grand jury subpoena, Ideker identified the exact boxes and learned that Schultz had a loan at Star Bank. On March 19, 1992, on the basis of the foregoing, Ideker obtained from the Hamilton County Municipal Court a warrant to search the safe deposit boxes. Ideker, a trained narcotics officer, conducted the search that same day and found $41,840.00 in U.S. currency in the boxes. He also thought he detected the odor of hashish coming from the boxes, and on the money was a black, tarry substance that Ideker believed to be hashish oil. He did not field test the substance. (A later test confirmed that it was not a controlled substance.)

Later that same day, Ideker obtained a second warrant, this time to search Apt. 509. The affidavit which supported this second warrant included the information from the first affidavit, plus Ideker's discovery of the money and belief that it was smudged with hashish oil, plus his discovery that Apt. 509 was Schultz's residence. Still on the same day, he and other officers conducted the search and found and seized controlled substance, U.S. currency, a triple-beam scale, financial records, keys to safe deposit boxes, and other material.

Later that day Ideker arrested Schultz and another individual and charged them with Trafficking in Marijuana in violation of Ohio Revised Code 2925.03. On April 15, 1992, Schultz was indicted in the Southern District of Ohio for possession of hashish oil

with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). Schultz was arrested by federal authorities on April 28, 1992, and the parallel state charges were dismissed.

On June 5, 1992, Schultz moved to suppress the fruits of the two searches on the ground that there had not been probable cause to support the warrants. The district court denied the motion on July 9, 1992, finding that (1) there was probable cause for both warrants, and (2) in any case, the "good faith" exception of *U.S. v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), applied. On July 17, 1992, Schultz entered a conditional guilty plea to the indictment, reserving his right to appeal the court's denial of his Motion to Suppress.

On appeal, Schultz continues to maintain that there were insufficient indicia of probable cause to issue either warrant. He argues further that, if this court were to find that there were sufficient indicia of probable cause for the second warrant but not for the first, he would still be entitled to have his conviction vacated because the second warrant was obtained with the poisonous fruits of the first warrant.

■ There was more than good reason for Officer Ideker to believe that a crime had been committed. Leek identified Schultz by name and supplied the telephone number from which he had ordered illegal substances. Moreover, Officer Ideker did not simply rely on a chain of finger-pointing by unproven informants. He conducted an independent investigation which established plausible links between Schultz and Florida and Jamaica; between Schultz and an ice-cream business fitting Reid's description; between Schultz and the phone number supplied by Leek; and between that phone number and Florida and Jamaica. All of this research—particularly Schultz's connection to the phone number—tended to corroborate Leek's direct identification of Schultz and served as a plausible basis for believing that Schultz had distributed illegal drugs.

■ Even without the fruits of the first search (the money in the safe deposit boxes), there was also sufficient reason for Ideker to

believe that he would find evidence of Schultz's involvement with illegal drugs at Apt. 509, the location of the second search. Ideker had discovered initially that automobiles registered to Schultz were parked in the apartment complex; eventually, he found that Schultz resided in Apt. 509. The number Leek said he had called to order drugs was registered to Schultz's female acquaintance at Schultz's own residence. This connection gave sufficient reason to believe that Schultz was distributing drugs from that residence, which in turn was sufficient reason to believe that evidence of that activity would be found there. True, the fruits of the first search were cited in the affidavit for the second warrant; but the second affidavit was sufficient to search the residence even without those fruits, and the second warrant was therefore valid.

■ Since the second search yielded all the controlled substance on the basis of which Schultz was convicted, his conviction stands regardless of whether the first warrant was valid. The first search, however—which produced money used in the sentencing phase of the case to increase the penalty—was also properly upheld by the district court.

Officer Ideker had not made any material connection between the bank and any criminal activity. Star Bank employees did not report any illegal activities related to either the loan or the safe deposit boxes, and Ideker had no other information connecting them to any illegal activity. In his affidavit for the first warrant, the only connection Ideker made was that, "Based on his training and experience, [he] believe[d] ... that it is not uncommon for the records, etc. of such [drug] distribution to be maintained in bank safe deposit boxes."

While an officer's "training and experience" may be considered in determining probable cause, *see, e.g., Texas v. Brown*, 460 U.S. 730, 742–43, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983); *U.S. v. Martin*, 920 F.2d 393, 399 (6th Cir.1990), it cannot substitute for the lack of evidentiary nexus in this case, prior to the search, between the safe deposit boxes and any criminal activity. Officer Ideker did not have anything more than a

guess that contraband or evidence of a crime would be found in the boxes, and therefore the first warrant should not have been issued. To find otherwise would be to invite general warrants authorizing searches of *any* property owned, rented, or otherwise used by a criminal suspect—just the type of broad warrant the Fourth Amendment was designed to foreclose.

Nevertheless, under current Supreme Court doctrine, the district court was correct to deny the Motion to Suppress, because the first warrant comes under the so-called "good faith" exception in *Leon,* 468 U.S. at 918–21, 104 S.Ct. at 3418–19. There is no evidence that Officer Ideker gave a knowingly false affidavit or otherwise acted in bad faith. The warrant was issued by a proper authority, and there is no evidence that the issuing magistrate had abandoned his neutral judicial role. Schultz is correct that a warrant "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" may be suppressed even when, as here, the warrant is facially valid and there is no evidence of bad faith or a biased magistrate. *Id.* at 923, 104 S.Ct. at 3420, quoting *Brown v. Illinois,* 422 U.S. 590, 611, 95 S.Ct. 2254, 2265, 45 L.Ed.2d 416 (1975) (Powell, J., concurring in part). But we cannot say that this warrant was "so lacking." As previously discussed, Officer Ideker certainly had probable cause to believe that Schultz had committed a crime. Moreover, although we have held that his "training and experience" were not sufficient to establish a nexus of probable cause between that crime and the safe deposit boxes, the connection was not so remote as to trip on the "so lacking" hurdle.

Thus, the first search warrant, too, properly survived the Motion to Suppress.

## II. The "Role in the Offense" Sentencing Issue

■ The district court sentenced Schultz to a prison term of 63 months, plus 5 years of supervised release, a fine of $25,000, and a $50 special assessment. This sentence was based on a total offense level of 17 and Criminal History Category of VI.

Because the Sentencing Guidelines dictate very different treatment of the three major categories of marijuana products—marijuana, hashish, and hashish oil—the trial court held an evidentiary hearing to help it determine the chemical identity of the marijuana product found in Schultz's home. After considerable and conflicting expert testimony, the court found that the definition of hashish oil in the Guidelines was too ambiguous to fit clearly the substance in question. The court therefore felt obliged by the rule of lenity to find that, for sentencing purposes, the substance was not hashish oil but mere hashish.

The original Presentence Investigation Report prepared by Probation Officer John C. Cole gave Schultz a base offense level of 28. As a result of the judge's ruling that the substance would be considered hashish and not hashish oil, the base level became 18. The Report awarded him a two-point reduction for his "acceptance of responsibility," and assigned him a two-point enhancement for his "role in the offense." The judge accepted the enhancement but gave Schultz a *three*-point reduction for his guilty plea. This left the total offense level at 17. Schultz appeals the two-point enhancement.

Section 3B1.1 of the Guidelines provides for the enhancement of an individual's offense level because of his aggravating role in the offense. Subsections (a) and (b) provide enhanced punishment for large criminal enterprises (involving five or more participants). Subsection (c) instructs a sentencing court to increase a defendant's offense level by two levels "if the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b)." U.S.S.G. § 3B1.1.

In the Presentence Report, the probation officer justified the enhancement under subsection (c) in the following manner:

> According to the DEA, Schultz was the source of supply to at least 4 other known individuals, though there was no extensive organizational structure. The background following the Third Application Note of the Commentary in 3B1.1 states that in relatively small criminal enterprises that are not otherwise to be considered as extensive in scope or in planning or preparation, the

distinction between organization and leadership and that of management and supervision is of less significance than in larger enterprises that tend to have clearly delineated divisions of responsibility. This is reflected in the inclusiveness of 3B1.1(c). Thus, Mr. Schultz, pursuant to ... Guideline Section 3B1.1(c), shall receive a 2 level enhancement.

The district court accepted this enhancement, finding that Schultz organized an operation that imported illegal drugs into the country and distributed them in the community.

■ "Role in the offense" is a traditional determination, made in every sentencing, which long antedates the Guidelines. Under the Guidelines, a "role in the offense" determination "is a factual one, which, upon appellate review, is subject to the clearly erroneous standard," *U.S. v. Williams,* 894 F.2d 208, 213–14 (6th Cir.1990), and Congress tells us that we "shall give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e).

■ Nothing in the record shows, with regard to this offense, that Schultz directly led, managed, or supervised others in Jamaica or Florida or Ohio in the manufacturing, importation, or distribution of controlled substances. It is well established in this Circuit that "enhancement pursuant to § 3B1.1 requires the participation of at least two culpable individuals so that leadership of some criminal enterprise or organization, however minimal, can be claimed." *U.S. v. Carroll,* 893 F.2d 1502, 1509 (6th Cir.1990). Furthermore, mere buying and selling, without other evidence, is not sufficient to show that a defendant is a leader, organizer, manager, or supervisor. *U.S. v. Mays,* 902 F.2d 1501, 1503 (10th Cir.1990); *U.S. v. Weidner,* 703 F.Supp. 1350, 1354 (N.D.Ind.1988), *aff'd,* 885 F.2d 873 (7th Cir.1989).

■ But these principles do not mean that the defendant must directly employ or control a partnership or enterprise. Organizing and coordinating an interstate, or, as the district court found in this case, an international scheme of distribution that brings contraband into a community for distribution on a continuing basis should be sufficient to qualify a single individual as an "organizer" of criminal activity. With due deference to the district court's factual findings, therefore, we affirm Schultz's two-point enhancement for his "role in the offense."

### III. The "Upward Departure" Sentencing Issue

■ Under the Federal Sentencing Guidelines, the calculation of a defendant's Criminal History Category is a rule-bound process for which there is less deference to the factfinder than in "role-in-the-offense" determinations. Criminal History Category calculations may include only (1) those convictions for which a sentence of imprisonment exceeding one year and one month was imposed, or for which any prison time was served, within fifteen years of the new offense; and (2) any other convictions imposed within ten years of the new offense. U.S.S.G. § 4A1.2(e). In his Presentence Report, Officer Cole calculated that Schultz's criminal history score was 5, which put him in Criminal History Category III. This calculation assigned points for two drug convictions and a drunken driving offense, but properly excluded two other convictions that were out of time.

In the first excluded case, Schultz was charged on October 30, 1974, with buying hashish oil from an undercover agent. He was sentenced on June 6, 1975, to five years' probation, and was discharged on July 1, 1976. This conviction could not count for criminal history purposes because the sentence did not include imprisonment and was more than ten years old. In the second excluded case, Schultz jumped bond and on May 20, 1977, was given a sentence of two years, suspended, and two years' probation. Again, no points were assessed on this conviction because the sentence included no imprisonment and was more than ten years old.

Using the total offense level of 17 and Criminal History Category of III, the guideline range for Schultz's sentence would have been 30 to 37 months' imprisonment and a fine of $5,000 to $1,000,000.

The court decided, however, to depart upward in the Criminal History Category. Pointing to the Adequacy of Criminal Histo-

ry Category Policy Statement, U.S.S.G. § 4A1.3., the court noted that

> if reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the court may consider imposing a sentence departing from the otherwise applicable guideline range. *Such information may include prior sentences not used in computing the criminal history category.*

(Emphasis added). Indicating that Category III did not adequately reflect the seriousness of Schultz's conduct, the court then took note of the two out-of-time convictions discussed above and stated that if they had been included in the calculation, each receiving one point under § 4A1.1.(c), Schultz's criminal history score would have been raised from 5 to 7, and his Category from III to IV.

The court went on to conclude that if the out-of-time convictions had not been excluded, Schultz "could be considered a career criminal or a career offender under 4B1.1.... This, in turn, would have resulted in a criminal history category of VI." Under § 4B1.1, a defendant "is a career offender if (1) the defendant was at least eighteen years old at the time of the instant offense, (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense, and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense." The third of these provisions would be active if the two out-of-time convictions were figured in. A career offender's Category is automatically VI, and § 4B1.1 also provides for an increase in the offense level attributed to a crime committed by a career offender. The court pointed to this provision to indicate that it would be entitled to impose a sentence of up to 188 (rather than 30 to 37) months, but would settle on a range of 51 to 63 months:

> Pursuant to the career offender guideline in Section 4B1.1, the offense level is increased based upon the statutory maximum penalty for the offense of conviction. Mr. Schultz pled guilty to an offense with the maximum penalty of 20 years. Therefore, if he were a career offender, his offense level would be 32, and allowing for a three-level reduction for acceptance of responsibility. The total offense level would be 29. With an offense level of 29 and a criminal history category of VI, the defendant would face the guideline range of 151 to 188 months.

The Court does not intend to increase the offense level in accordance with the career offender guideline because of its previous rulings regarding the ambiguity of the guideline and the statute, as they relate to the sentence involved. However, the Court does find that the Criminal History Category of VI reflects the actual criminal history of the defendant inasmuch as he has been convicted on three occasions over the past 17 years for essentially the same conduct. Therefore, the court intends to make an upward departure using criminal history of VI and an offense guideline of 17 which results in the guideline range of 51 to 63 months.

At a subsequent hearing on this proposed departure, the judge explained his reasons. These included the fact that, on the question of whether the substance was hashish or hashish oil, "We followed the Rule of Lenity reluctantly which benefited the defendant." The judge continued:

> [T]he defendant has persisted in smuggling, selling and possessing the same illegal material for over a lengthy period of time, and apparently his prior sentencings in these materials has had no deterring effect on him.

It is obvious to this Court that the defendant is a recidivist, one who repeats crimes and apparently does not learn from experience, and based on his past conduct we have no assurance that he won't violate them in the future.

The main problem in this Court's mind is that this defendant is at the highest level of the drug distribution system in this country. He is a source of the material who supplies and provides material to suppliers who corrupt their distributors and customers and untold addicts on the street. We haven't any idea how many children

and young adults may have been corrupted and destroyed by the defendant's supply of materials he was bringing into the country, nor do we have any idea how many people who may have graduated, or descended— whatever term you want to use—from the use of marijuana to high-powered marijuana to cocaine, heroin, and other kinds of drugs which destroy minds and destroy bodies.

I conclude that this defendant is a serious menace to society and that's the reason for the upward departure in this case.

Using the total offense level of 17 and Criminal History Category of VI, the judge thereupon sentenced Schultz to 63 months' imprisonment, 5 years' supervised release, a fine of $25,000, and a $50 assessment.

Schultz appeals the upward departure as improperly counting the excluded convictions. He maintains that, even if the convictions were counted, his Category would be IV, not VI. Accordingly, he suggests, his sentencing range should be 30–37 months (for Category III) or, at most, 37–46 months (for Category IV), not the 51–63 months chosen by the judge.

As noted by the district court, the Sentencing Guidelines permit upward departure if "the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes." Departure may be based on "information concerning … prior sentence(s) not used in computing the criminal history category." U.S.S.G. § 4A1.3.(a).

■ Application Note 8 under § 4A1.2. also supports departure based on out-of-time convictions:

*Applicable Time Period.* Section 4A1.2(d)(2) and (e) establishes the time period within which prior sentences are counted. . . . If the court finds that a sentence imposed outside this time period is evidence of similar, or serious dissimilar, criminal conduct, the court may consider this information in determining whether an upward departure is warranted under § 4A1.3 (Adequacy of Criminal History Category).

The court was thus entitled to use the two out-of-time convictions to depart upward from Category III. However, it was *not* entitled to use those out-of-time convictions to establish "Career Offender" status and reach Category VI.

Sixth Circuit precedent establishes that "The district court cannot arbitrarily change the requirements for career offender status established by the Sentencing Commission." *U.S. v. Robison,* 904 F.2d 365, 372–73 (6th Cir.1990). In *Robison,* the defendant's Criminal History Category was increased to VI on the basis of a 12–year–old out-of-time conviction, because the trial judge believed the defendant had received "a real break from the sentencing judge in that case." *Id.* at 372. The record shows that in the instant case the judge was similarly motivated by his belief that the defendant had received a break, this time from his own court and in the very case at hand: his ruling that, for sentencing purposes, the substance was hashish and not hashish oil.

■ As the *Robison* court notes, Application Note 4 in the Commentary to § 4B1.2 specifically states that "The provisions of § 4A1.2 (Definitions and Instructions for Computing Criminal History) are applicable to the counting of convictions under § 4B1.1." *See Robison,* 904 F.2d at 372. § 4A1.2(e) is the provision excluding out-of-time convictions; § 4B1.1 is the provision for determining career offender status. As a result, under the Guidelines and *Robison,* out-of-time convictions excluded from calculating Criminal History Category may not be used to find career offender status.

Since the district court's departure to Category VI cannot be grounded on the assignment to Schultz of career offender status, we must now determine whether it is supported by the court's explanation for the appropriateness of an upward departure from Category III.

■ A court departing upward from a defendant's calculated Criminal History Category must satisfy two requirements:

(1) The court must "articulate its reasons for departing from the guidelines in language relating to the guidelines."

(2) Where the court "depart[s] beyond the next higher criminal category" it must demonstrate "either that it first looked to the next higher criminal history category for guidance or that it found the sentence under the next higher criminal history category too lenient."

*United States v. Kennedy,* 893 F.2d 825, 829 (6th Cir.1990); *see also Robison,* 904 F.2d at 372.

■■■ As described and quoted above, the trial court did explain, in language relating to the Guidelines, why it was departing from Category III (Schultz's recidivism), and it did mention Category IV as a reasonable stopping point. However, after mentioning Category IV in an approving way, it then reached Category VI without explaining why Category IV was inadequate, and without even mentioning Category V.

■■■ For both of these reasons, therefore—the use of out-of-time convictions to find career offender status, and the failure to explain why Category IV was not an adequate level—we vacate the upward departure. We remand the case to the district court for resentencing in accordance with the rules established in *Kennedy, supra:* in any upward departure, the court must move stepwise up the ladder of criminal history categories and must make specific findings, articulated in language relating to the guidelines, concerning the inadequacy of any sentencing categories passed over.

### IV.

For the reasons stated above, we AFFIRM the conviction of James Schultz, VACATE Schultz's sentence, and REMAND for resentencing in a manner consistent with this opinion.