48 F.3d 1220
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Timothy CAPPS, Dwayne Evans, Ray Parra, Defendants-Appellants.
 Nos. 93-3718, 93-3721, 93-3719, 93-3720.
 United States Court of Appeals, Sixth Circuit.
 March 10, 1995.
 
 Before: BROWN, MARTIN, and BOGGS, Circuit Judges;
 PER CURIAM.
 
 
 1
 On April 29, 1993, a grand jury indicted Defendants-Appellants Timothy Capps, Dwayne Evans, and Raymond Parra for conspiring to distribute cocaine in violation of 21 U.S.C. Secs. 841 and 846. The grand jury also indicted each defendant for knowingly using a telephone to facilitate a drug offense, which violated 21 U.S.C. Sec. 843(b). In addition to these common charges, Evans was indicted for conspiring to import cocaine, a violation of 21 U.S.C. Sec. 963. A jury found them guilty on all counts. For these crimes, Capps was sentenced to 240 months in prison, Evans received 151 months, and Parra received 380 months. The defendants appealed.
 
 
 2
 All told, the defendants raise over twenty issues for our consideration. Most of these, however, simply challenge the sufficiency of the prosecution's evidence. For the reasons that follow, we affirm the defendants' convictions. However, because the district court did not properly apply the Sentencing Guidelines to the convictions for conspiring to distribute cocaine, we must vacate the defendants' sentences and remand for resentencing in accordance with this opinion.
 
 
 3
 A brief summary of the issues the defendants raise is as follows: First, does sufficient evidence support their conspiracy convictions? Second, did the district court err by admitting evidence under the co-conspirator exception to the hearsay rule? Third, does sufficient evidence support their convictions for using a telephone to facilitate a drug offense? Fourth, did the district court err by admitting Parra's weapons and bulletproof vest? Fifth, did the district court err by not allowing the defendants access to certain statements under the Jencks Act? Sixth, was the amount of cocaine imputed to the defendants for the purposes of sentencing pursuant to the conspiracy charge reasonably foreseeable, and was that amount distributed within the scope of each defendant's jointly undertaken criminal activity? Seventh, did the district court clearly err under the Sentencing Guidelines by enhancing Parra's offense level for possessing a firearm? And eighth, did the district court clearly err by enhancing Parra's offense level for his role in the conspiracy? We address these issues seriatim.
 
 I.
 
 4
 According to the first count of the indictment, the defendants and sixteen others conspired to distribute cocaine in the Cleveland area at least as early as February of 1990. This was not a small conspiracy. It involved over a million dollars worth of cocaine--at least fifty kilograms. At the heart of this conspiracy were two cousins, Paul and Brian Davis. Paul was the buyer and seller, and Brian was Paul's accountant and deliveryman. Brian would receive and deliver cocaine, collect drug debts, and keep track of the parties' varying balances in a ledger book which the police later seized. Paul and Brian were also the Government's star witnesses.
 
 
 5
 To support its case, the Government offered recorded telephone conversations, Brian Davis' ledger book, and the testimony of numerous co-conspirators. This evidence showed that, in all likelihood, the conspiracy began in the fall of 1990, when Paul Davis and Dwayne Evans travelled to the Bahamas two or three times to purchase cocaine. Davis would find the cocaine, and Evans would find a carrier, or "mule," who would carry the cocaine back to Cleveland. This arrangement worked well until Evans and one of his mules were arrested in Florida in January of 1991. After that, Davis and Evans decided to find a local supplier. By the spring of 1991, one of those suppliers was Raymond Parra. Parra would sell cocaine to Davis, who would sell it to others, including Capps and Evans, for resale. In the late summer of 1991, Parra stopped selling cocaine to Davis, but Davis found yet another supplier in Delroy Chance. Chance was also convicted on the conspiracy count, but did not file a timely notice of appeal.
 
 
 6
 Because this appeal involves only Capps, Evans, and Parra, we focus mainly on their relationship to the conspiracy, as well as their substantive violations under 21 U.S.C. Sec. 843(b), the illegal use of the telephone.
 
 A. Capps
 
 7
 Capps began dealing drugs with the Davises as early as the spring of 1991. Brian Davis would usually deliver about an eighth of a kilogram to Capps, who would transform it into crack cocaine and sell it. Paul Davis talked to Capps about cocaine approximately once a week throughout the summer of 1991, and Brian Davis delivered cocaine to Capps about twenty times. In addition, Capps had his own personal code number for Brian Davis' pager, and called that pager over forty-one times in less than a thirty days. Finally, Capps was mentioned in Brian Davis' ledger book as owing him money for cocaine.
 
 
 8
 The telephone conversation which led to Capps' conviction under 21 U.S.C. Sec. 843(b) concerned a $600 debt. The conversation was with Paul Davis, and Paul did not remember if the money Capps owed was for drugs or gambling. However, Capps owed the money to Brian Davis, not Paul, and Brian did not gamble. Capps was convicted of conspiring to distribute cocaine and illegally using a telephone to facilitate cocaine distribution.
 
 B. Evans
 
 9
 As mentioned earlier, Dwayne Evans aided Paul Davis in importing cocaine from the Bahamas as early as the fall of 1990. In Cleveland, Evans would sometimes supply Paul Davis with cocaine, and Davis would sometimes supply Evans. Brian Davis delivered up to a kilogram of cocaine to Evans more than a dozen times, which Evans would buy on credit or pay for in cash. Furthermore, Brian Davis' ledger book contained Evans' name and the balance he owed of cocaine and money.
 
 
 10
 Also, Evans made two calls which the jury found facilitated the conspiracy. In the first call, Paul Davis told Evans that he had some "change" for him. Paul testified that "change" meant drug money. In the second call, Evans asked Paul if he "had it together" so he could "zoom". Paul testified that this conversation referred to money Evans needed to travel to purchase cocaine. Evans was convicted of conspiring to distribute cocaine, as well as conspiring to import cocaine. He was also convicted of using a telephone to facilitate a drug offense.
 
 C. Parra
 
 11
 Raymond Parra began supplying the Davises with cocaine in April or May of 1991. Parra would supply Paul Davis with between one and two kilograms every other week, which Paul would buy on credit. Brian Davis testified that he paid Parra thousands of dollars "no more than a dozen times," and that the largest payment was "not over $50,000." Brian also testified seeing Parra with seven or eight kilograms of cocaine at a house rented by Paul. Finally Paul Davis called Parra, and Parra asked him if he had "some change". Parra was convicted of conspiring to distribute cocaine and using a telephone to facilitate the distribution of drugs.
 
 II.
 
 12
 All three defendants claim that there was insufficient evidence to convict them of a conspiracy. In short, they argue that there was no conspiracy, but rather a number of independent buyer/seller relationships. In the alternative, they argue that this was not a single conspiracy, but a number of smaller ones.
 
 
 13
 In reviewing whether there is sufficient evidence to support a conviction, we view the evidence in the light most favorable to the prosecution. Jackson v. Virginia, 443 U.S. 307, 319 (1979). If, after doing so, we find that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," we must affirm the conviction. Id. Moreover, this court will not question the credibility of any witness. Credibility concerns the quality of the evidence, not its sufficiency to support a conviction. United States v. Sanchez, 928 F.2d 1450, 1457 (6th Cir.1991).
 
 
 14
 To prove a conspiracy under 21 U.S.C. Sec. 846, "the government is required to prove the existence of an agreement to violate the drug laws and that each conspirator knew of, intended to join, and participated in the conspiracy." United States v. Lee, 991 F.2d 343, 348 (6th Cir.1993). Circumstantial evidence alone is sufficient to prove the conspiracy's existence, and a formal agreement is unnecessary. United States v. Lloyd, 10 F.3d 1197, 1210 (6th Cir.1993) cert. denied, --- U.S. ----, 114 S.Ct. 1569 (1993). Rather, a tacit agreement is adequate. Id. Furthermore, the government does not need to prove that each conspirator knew every member of the conspiracy, or the full extent of the conspiracy; such facts may be inferred from the interdependence of the enterprise. Id. "One can assume that participants understand that they are participating in a joint enterprise because success is dependent on the success of those from whom they buy and to whom they sell." United States v. Bourjaily, 781 F.2d 539, 544 (6th Cir.1986), aff'd, 483 U.S. 171 (1987).
 
 
 15
 Viewing the evidence in the light most favorable to the prosecution, we conclude that there was adequate proof that a conspiracy existed among Parra, Evans, Capps, and the Davises. These defendants were involved in more than one-time deals. Parra regularly supplied Davis with large quantities of cocaine, and Davis regularly supplied Capps with smaller amounts. Capps would then turn that cocaine into crack and sell it to others. In operating this business, Capps depended on Paul Davis who depended on Parra, and vice versa. Evans supplied cocaine to Davis, and bought it from him. Thus, he also benefited from Capps' crack-sales and Parra's large supplies of cocaine. Furthermore, Evans cooperated with Davis in importing cocaine from the Bahamas for distribution in Cleveland.
 
 
 16
 A rational trier of fact could certainly infer an agreement to distribute cocaine from the interdependence of this enterprise. Thus, sufficient evidence supports the defendants' convictions under 21 U.S.C. Sec. 846.
 
 III.
 
 17
 The defendants also challenge the admissibility of co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E). The defendants had a continuing objection to all co-conspirator testimony, which the court overruled. The court followed the reasoning of Bourjaily, and allowed the co-conspirator statements in conditionally, reserving judgment on their admissibility until the close of the government's case. Bourjaily v. United States, 483 U.S. 171, 181 (1987). In order to admit statements under Federal Rule of Evidence 801(d)(2)(E), the government must show that a conspiracy existed, that the defendant was a member of that conspiracy, and that the statements were made in the course of and in the furtherance of the conspiracy. Id. at 175. Although the district court did not expressly rule on the matter, it inferentially ruled that (1) the defendants were members of the same conspiracy, and that (2) the statements were made in furtherance of that conspiracy. We conclude, based on our review of the record, that this finding was not clearly erroneous. We therefore uphold the district court on this issue.
 
 IV.
 
 18
 The defendants also argue that several of their convictions under 21 U.S.C. Sec. 843(b) for using telephones to facilitate a drug offense were not supported by sufficient evidence. This is also a factual determination which we will view in the light most favorable to the prosecution, and uphold if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319.
 
 A. Capps
 
 19
 Capps called Paul Davis concerning a $600 debt. Capps argues that his conviction for illegally using a telephone was not supported by sufficient evidence because Paul Davis could not testify at the trial as to whether the debt was for drugs or for gambling. However, Capps actually owed the money to Brian Davis, and Brian Davis did not gamble, but only sold drugs to Capps. Viewing the evidence in the light most favorable to the prosecution, we find that a jury could conclude that the call concerned a drug debt, and thus facilitated a drug offense.
 
 B. Evans
 
 20
 Evans argues that his conviction for using a telephone to facilitate a drug offense was not supported by sufficient evidence because the conversation in question concerned money for a trip, not for drugs. However, Davis testified that the conversation was about money Evans needed to take a trip to obtain cocaine. Viewing this evidence in the light most favorable to the prosecution, we find that a jury could conclude that the telephone call concerned money for a drug trip, and thus facilitated a drug offense.
 
 C. Parra
 
 21
 Parra also argues that his conviction for using a telephone to facilitate a drug offense was not supported by sufficient evidence. In the conversation in question, Parra asked Davis if he had any "change" for him. Parra's claim rests on the fact that Davis could not remember if "change" referred to drug money. However, there is evidence that at the time of the call, Davis did in fact owe Parra money for drugs. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude that the conversation therefore concerned drug money. Thus, sufficient evidence supports this conviction.
 
 V.
 
 22
 Parra further contends that his weapons, bulletproof vest, and almost $6000 in cash were improperly admitted as proof of the conspiracy. (Parra was not charged with a firearm offense for possessing these weapons). These items were seized in January of 1992, and Parra was involved in distributing drugs through April of that year. The police found no drugs when they seized the evidence. One of the weapons, however, was seized in Parra's vehicle near a lounge where Parra often made drug deliveries. Parra argues that the district court did not give a basis for admitting this evidence, and that in any case it should not have been admitted because its prejudicial effect outweighed its probative value.
 
 
 23
 Normally, weapons are admissible under Federal Rule of Evidence 401 as "tools of the drug trade." As we have stated previously:
 
 
 24
 Experience on the trial and appellate benches has taught that substantial dealers keep firearms on their premises as tools of the trade almost to the same extent they keep scales, glassine bags, cutting equipment and other narcotics equipment.
 
 
 25
 United States v. Wiener, 534 F.2d 15, 18 (2d Cir.1976), cert. denied 429 U.S. 820 (1976), quoted in United States v. Marino, 658 F.2d 1120, 1123 (6th Cir.1981). The record indicates that this was the reasoning used by the district court. J-A at 783.
 
 
 26
 The court also found that the probative value of the evidence outweighed its prejudicial effect under Federal Rule of Evidence 403. In reviewing a district court's ruling under Federal Rule of Evidence 403, we will maximize the probative value of the evidence and minimize its improper prejudicial effect. United States v. Kelley, 849 F.2d 999, 1003 (6th Cir.1988) cert. denied 488 U.S. 982 (1988). Here, no drugs were found with the weapons, bulletproof vest, and cash. However, a district court could conclude that possessing the "tools of the drug trade" during the life of the charged conspiracy and near the place where the defendant conducted drug transactions tended to prove that the defendant was involved with the drug conspiracy. The court could also conclude that the prejudicial effect was negligible. Given these facts, the district court did not abuse its discretion in admitting the evidence.
 
 
 27
 Some confusion arises because the district court then issued a limiting instruction stating that this evidence was not to be used against Evans or Capps. However, if there was only a single conspiracy, then the weapons should have been admitted as evidence against all of the co-conspirators. Thus, the district court may have erred in issuing the limiting instruction, but this error did not prejudice Parra.
 
 VI.
 
 28
 Evans also appeals the district court's denial of three specific requests for statements under the Jencks Act. 18 U.S.C. Sec. 3500(b). We will only reverse these rulings if the district court abused its discretion. United States v. Miller, 771 F.2d 1219, 1229 (9th Cir.1985).
 
 
 29
 Under the Jencks Act, the district court "shall ... order the United States to produce any statement ... of the witness ... in the possession of the United States which relates to the subject matter as to which the witness testified [on direct examination]" 18 U.S.C. Sec. 3500(b); United States v. Susskind, 4 F.3d 1400, 1404, 05 (6th Cir.1993) cert. denied, --- U.S. ----, 114 S.Ct. 1098 (1994). Furthermore, statements prepared by a government employee relating to the subject matter of the witness's direct testimony must be "signed or otherwise adopted or approved" by the witness to be "statements" of the witness. Goldberg v. United States, 425 U.S. 94, 98 (1976).
 
 
 30
 Evans' first request was for statements by a witness named Ken Lewis; actually, Evans asked for "all [the government's] interview notes or any 302's, any other type of memoranda, tape recording that reflects their interviews with ... Lewis." J-A at 762. There is no indication that any of these were "statements" of Lewis within the meaning of Jencks Act. Thus, the district court did not abuse its discretion in denying this motion.
 
 
 31
 Second, Evans' requested statements of witness Michael Jones which were contained in the pleadings and interrogatories of a pending civil forfeiture action. However, the civil forfeiture action was not even mentioned during the direct examination, much less the subject matter of it. Thus, the district court did not err in denying this request.
 
 
 32
 Lastly, Evans requested the prosecutor's notes relating to the an interview of the witness Troy Hobbs. This request raises a slightly more colorable claim, for it is possible that Hobbs had adopted the prosecutor's notes as his own:
 
 
 33
 Defense Counsel--[The Government Lawyer] would take notes on what you would say; is that correct?
 
 
 34
 Hobbs--Yeah.
 
 
 35
 Defense Counsel--And then he would read it back to be sure he had it right?
 
 
 36
 Hobbs--Yeah.
 
 
 37
 J-A at 878. The district court denied the request, however, reasoning that just because the prosecutor read notes back to the witness, that did not mean the witness adopted those notes. J-A at 892. Apparently, there was some question regarding whether the prosecutor read his notes or a separate FBI report back to Hobbs. The prosecutor denied reading the witness his notes, and, in any event, the separate FBI report was in fact turned over to the defense. Given these facts, we cannot say that the district court erred by denying the defendant's request.
 
 VII.
 
 38
 The district court found that Capps could reasonably foresee that the conspiracy involved over five kilograms of cocaine, and sentenced him to 240 months under 21 U.S.C. Sec. 841(b). The court found that Evans could reasonably foresee over fifteen kilograms, and gave him 151 months under the Guidelines. Parra was sentenced under the Guidelines to 380 months based on the district court's finding that he could reasonably foresee that the conspiracy involved over fifty kilograms. All three defendants challenge their sentences, each arguing that he could not reasonably foresee the amount of cocaine distributed by his co-conspirators and imputed onto him. This is not quite the right argument. The district court improperly applied the Sentencing Guidelines, but it did not err with regard to the amount of cocaine each defendant could reasonably foresee would be distributed. Rather, it erred by not determining the scope of the criminal activity that each defendant jointly undertook with his co-conspirators.
 
 
 39
 Under the Sentencing Guidelines, there are two specific considerations which limit a defendant's accountability for someone else's conduct; first, the other person's conduct must be in furtherance of the defendant's jointly undertaken criminal activity; and second, that conduct must be reasonably foreseeable to the defendant. United States Sentencing Commission, Guideline Manual, Sec. 1B1.3(a)(1)(B) (Nov. 1992). The district court in this case only determined the amount of cocaine each defendant could reasonably foresee, and never addressed the scope of each defendant's jointly undertaken criminal activity. As we noted in United States v. Jenkins, however, "foreseeability alone provides scant practical limitation. 'In the case of heroin and cocaine, each seller knows that every transaction requires an extensive network of importers and distributors handling large quantities.' " 4 F.3d 1338, 1346 (6th Cir.1993) (quoting Stephen J. Schulhofer, Excessive Uniformity--And How to Fix It, 5 Federal Sentencing Reporter 169, 170 (1992)) cert. denied, --- U.S. ----, 114 S.Ct. 1547 (1994).
 
 
 40
 Indeed, we recently reversed a district court because it held the defendant responsible for drugs involved in the entire conspiracy without making any findings regarding the scope of the jointly undertaken criminal activity. United States v. Okayfor, 996 F.2d 116, 121 (6th Cir.1993) (per curiam), cert. denied, --- U.S. ----, 114 S.Ct. 238 (1993). In Okayfor, we noted that "the scope of the conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy". Id. at 120 (citations omitted). See also, U.S.S.G. Sec. 1B1.3 comment. (n. 2); Jenkins, 4 F.3d at 1347. Thus, a defendant's "jointly undertaken criminal activity" is not necessarily as extensive as the conspiracy for which he was convicted.
 
 
 41
 We further note that the district court should apply the standard we set out here under U.S.S.G. Sec. 1B1.3 in determining sentences as prescribed by 21 U.S.C. Sec. 841(b).[1] United States v. Young, 997 F.2d 1204, 1210 (7th Cir.1993); United States v. Rogers, 982 F.2d 1241, 1246 (8th Cir.1993) cert. denied, --- U.S. ----, 113 S.Ct. 3017 (1993); United States v. Martinez, 987 F.2d 920, 926 (2d Cir.1993). This approach "permits the administration of the statute in a way that does no violence to the approach of the Sentencing Guidelines." Young, 997 F.2d at 1210.
 
 
 42
 In sum, because the district court erred by not determining each defendant's jointly undertaken criminal activity, we must vacate all three defendants sentences, and remand their cases for resentencing on this specific point. On remand the district court should address two issues which were not addressed before: First, what was the scope of each defendants' jointly undertaken criminal activity? And second, how much cocaine was distributed in furtherance of that activity?
 
 VIII.
 
 43
 In addition to challenging his base offense level, Parra also challenges his two-level increase for possessing a firearm in connection with the conspiracy, U.S.S.G. Sec. 2D1.1(b)(2), and his three-level increase for his "role in the offense". U.S.S.G. Sec. 3B1.1(b). We find that the court did not err by adding two levels for Parra's firearm possession, but that the court did err in computing Parra's role in the offense.
 
 1. Use of Firearm
 
 44
 The defendant argues that the district court erred by enhancing his sentence two levels for possessing a firearm during the commission of the offense. We will reverse a district court's ruling on this point only if it is clearly erroneous. United States v. Duncan, 918 F.2d 647, 650 (6th Cir.1990), cert. denied 500 U.S. 933 (1991).
 
 
 45
 The Guidelines mandate a two-level increase when a firearm is possessed during a drug-related crime. U.S.S.G. Sec. 2D1.1(b)(1). According to the commentary, "the adjustment should be applied if the weapon was present, unless it was clearly improbable that the weapon was connected with the offense." U.S.S.G. Sec. 2D1.1, comment (n. 3). Thus, "the possession of a firearm during the commission of the offense establishes a presumption that the possession is connected with the offense." United States v. Moreno, 899 F.2d 465, 470 (6th Cir.1990). Parra possessed a firearm during the life of the conspiracy. The district court presumed that the firearm was connected to the conspiracy, and added two levels. The defendant cites no evidence rebutting this presumption. Thus, the district court did not err in enhancing Parra's offense two levels for possession of the firearm.
 
 2. Role in the Offense
 
 46
 Finally, Parra, citing no support, argues that he was not a supervisor of the conspiracy, as was determined by the district court, and that it therefore erred by adding three points to his base offense level. In rebuttal, the Government merely cites United States v. Schultz, 14 F.3d 1093 (6th Cir.1994), and argues that the district court's decision was not clearly erroneous. In Schultz, however, we found that the defendant was an "organizer" of the conspiracy, not a "supervisor". Id. at 1099. Under the Guidelines, we review a district court's findings of fact with regard to a "role in the offense" determination under a clearly erroneous standard. Schultz, 14 F.3d at 1099.
 
 
 47
 The sum total of the district court's findings of fact on the issue of Parra's role in the offense is as follows:
 
 
 48
 Government Counsel--the government believes that based on the fact that the defendant supplied the cocaine, and to the extent that he controlled the home,[2] supplied the people to whom it was delivered, and made arrangements for the delivery of it, the government believes that as the supplier of these kilograms of cocaine that is involved in the organizational approach to distribution of cocaine that his involvement in the conspiracy is extensive, that under the guidelines it entitles this Court to consider the increase of three levels.
 
 
 49
 The Court--Section 3B1.1(b), considering the evidence in this case, it isn't--the defendant isn't just a person that somebody gives cocaine to and says take this cocaine to Cleveland. The evidence, as I heard it, shows that this defendant is a person who determines who is going to get the cocaine himself, and when he wants to give it to them, what have you. So we have a supervisory role. Three points are added.
 
 
 50
 J-A at 1138-39.
 
 
 51
 Under U.S.S.G. Sec. 3B1.1, an organizer or leader of a criminal activity involving five or more participants receives a four-level enhancement; a supervisor or manager of such an activity receives a three-level enhancement; and an organizer, leader, supervisor, or manager of a criminal activity involving less than five participants receives a two-level enhancement.
 
 
 52
 According to Application Note 3 of U.S.S.G. Sec. 3B1.1, a court should consider a number of factors in distinguishing between a leader, organizer, manager, or supervisor. These factors include:
 
 
 53
 the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.
 
 
 54
 U.S.S.G. Sec. 3B1.1 (n. 3). Unfortunately, the guidelines do not indicate precisely how these factors should be used in distinguishing between roles in the offense. In other words, the guidelines give no hint as to which factors show that a person is, for example, an "organizer," as opposed to a "supervisor," or a "leader", as opposed to an "organizer."
 
 
 55
 Given the structure of this section, it is possible to conclude that so long as the defendant meets some of the factors enumerated in Application Note 3, he may be considered either an "organizer," "leader," "manager," or "supervisor," and that it does not matter very much how the district court defines him. It is also possible to conclude, given the structure of this section, that a "supervisor" or "manager" is merely an "organizer" or "leader" with less responsibility, and that every "organizer", for example, therefore automatically qualifies as a "supervisor."
 
 
 56
 We reject this position, however, as contrary to the plain meaning of the guidelines as well as the law of this circuit. First of all, the guidelines lay out four different possible roles in the offense: "organizer," "leader," "manager," and "supervisor." If, in actuality, these all referred to the same type of conduct, there would have been no need to use four different terms. Secondly, the term "organizer," at least, contemplates a function that may be different from a "leader," "manager," or "supervisor." An organizer is one who "organizes", which is commonly defined as "to arrange or form into a coherent unity or functioning whole." WEBSTER'S NEW COLLEGIATE DICTIONARY 802 (1979). A "leader" on the other hand, is one who "leads", which is commonly defined as "to direct the operations, activity, or performance of." Id. at 647. Thus, an organizer need not exercise control over any particular activity, he only need arrange it. Two examples from our caselaw best reveal this difference.
 
 
 57
 In United States v. Williams, 894 F.2d 208 (6th Cir.1990), the court upheld the the defendant's enhancement for his role in the offense because he admitted that he "set up" the cocaine transaction. The court found that was "sufficient to support the sentencing court's characterization of him as organizer." Id. at 214. However, one who merely sets up a transaction could not also be considered a "supervisor," "leader," or "manager," in that he did not supervise, lead, or manage anyone. See, e.g., United States v. Brown, 944 F.2d 1377, 1380 (7th Cir.1991); United States v. Mares-Morlina, 913 F.2d 770, 773 (9th Cir.1991); United States v. Lanese, 890 F2d 1284, 1293 (2d Cir, 1989) (all holding that supervision or control of others is necessary to uphold a determination that a person is a leader, supervisor, or manager.)
 
 
 58
 United States v. Schultz, 14 F.3d 1093 (6th Cir.1994), provides the second example. Schultz involved a defendant who brought large amounts of marijuana hash into Ohio and sold it to others for resale on a regular basis. The court first stated that "nothing in the record shows, with regard to this offense, that Schultz directly led, managed, or supervised others in Jamaica or Florida or Ohio in the manufacturing, importation, or distribution of controlled substances." Id. at 1099. Nevertheless, the court upheld the enhancement, reasoning that, "[o]rganizing and coordinating an interstate, or, as the district court found in this case, an international scheme of distribution that brings contraband into a community for distribution on a regular basis should be sufficient to qualify a single individual as an 'organizer' of criminal activity." Id. Thus, the defendant in Schultz, by carefully choosing and regularly supplying the middlemen who then resold the drugs, effectively "organized" the manner in which his drugs reached the streets.
 
 
 59
 Schultz is analogous to the case at hand, and if the district court had found Parra to be an organizer, worthy of a four-point enhancement, we would have no trouble upholding its determination under a clearly erroneous standard. Unfortunately, it found him to be a supervisor, worthy of only a three-point enhancement. In its findings of fact, however, the district court did not indicate how Parra supervised others. Rather, it based its decision solely on Parra's role as the regular (and major) supplier to Paul Davis. This is insufficient to support a finding that Parra was a "supervisor" of the conspiracy. Therefore, we must also vacate and remand this portion of Parra's sentence.
 
 
 60
 We do note that there very well may be evidence in the record from which the district court could possibly infer that Parra was a supervisor of others, and that it is possible we would uphold such inferences under a clearly erroneous standard. We decline to draw such inferences ourselves, however, in that our task is to review the findings of the district court. The district court should make the factual findings in the first instance. Thus, on remand, the district court may reconsider Parra's role in the offense, either as an "organizer," "leader," "supervisor," or "manager." Regardless of its decision, however, the district court should make specific factual findings in support of its determination.
 
 IX.
 
 61
 For the reasons stated above, we AFFIRM the convictions of Timothy Capps, Dwight Evans, and Raymond Parra. However, we VACATE the defendants' sentences and REMAND for resentencing in accordance with this opinion.
 
 
 62
 BOGGS, Circuit Judge, concurring.
 
 
 63
 I concur in the court's opinion except for the reasoning used in Section VIII.2 reversing the enhancement given to Parra for his role in the offense. Because I believe the court has used the wrong standard, I concur only in the result.
 
 
 64
 I agree that the district court's findings, while not erroneous per se, are inadequate to support the enhancement for being a manager or supervisor. The district court is obliged to not only state its finding regarding the enhancement, but also to lay out the underlying factual foundation through appropriate findings. See, e.g., United States v. Greenfield, --- F.3d ----, 1995 WL 15891 (2d Cir. Jan. 13, 1995). In this case, the district court should either refrain from enhancing the sentence, or should provide the factual underpinnings, in the form of findings, that lead the district court to conclude that Parra was a manager or supervisor of the criminal activity.
 
 
 65
 There is ample evidence, if the district court chooses to credit it, showing that Parra was a major supplier to persons who were themselves major dealers to others further down the chain. In particular, the very large amounts of cocaine that Parra sold to the Davises (one or two kilos every other week), and the receipt of up to $50,000 approximately a dozen times, bespeaks an involvement wildly out of line with the notion of a mere "buyer-seller" relationship, which tends to denote individual street-level deals. At this quantity, there can be no doubt that he was supplying for resale, and that he sold to persons who were themselves selling to resellers. Moreover, Parra was seen with even larger amounts at a home rented by one of those to whom he sold large quantities. For a brief description of the scope of the transactions in question and the size of the conspiracy see J.A. 398-400, 614-18, 926.
 
 
 66
 In addition there is ample evidence that Parra did more than just make sales. Parra recruited accomplices and cultivated a distribution network that initially saw Paul Davis as his buyer, with Paul redistributing it for sale to his brother, Brian Davis, and to Tyrone Wilkinson. Eventually Tyrone Wilkinson became a direct buyer from Parra. J.A. 747. Apparently he also reorganized his distribution system with the agreement of the Davis brothers, to eliminate the delivery of cocaine to anyone other than Brian Davis. J.A. 606. Parra was concerned about where and how repayment was coming. He directed people as to how they should make payments to him, including using others such as Jackie Tate to collect money, or directing his buyers to make payments to Tyrone Wilkinson. J.A. 741-46, 930, 944-45. Furthermore, the record implicates Parra in a scheme to transport cocaine from Florida with the assistance of Paul Davis. J.A. 177, 317 & 423. Apparently Parra was organizing a trip south with Stanley Meredith in the hopes of securing cocaine.
 
 
 67
 Given these circumstances, if credited, Parra clearly and directly meets two of the Ospina factors. United States v. Ospina, 18 F.3d 1332, 1337 (6th Cir.1994): the nature and scope of the illegal activity and the nature of participation in the commission of the offense. Parra may also meet several other Ospina factors including, at a minimum, recruitment of accomplices, and decision-making authority. Furthermore, by implication it is reasonable to assume that if Parra was directing payments to Tate and Wilkinson, he had some control or authority over them to insure the delivery to him of his money. All of the evidence indicates a conspiracy in which the degree of planning was significant, and in which Parra played a major role.
 
 
 68
 To the extent that the court's opinion implies that the district court should have ruled in June of 1993, that a defendant must supervise other "persons" to be eligible for this enhancement, I disagree. See, e.g., "in that he did not supervise, lead, or manage anyone " (p. 17); "In its findings of fact, however, the district court did not indicate how Parra supervised others " (p. 18); "We do note that there very well may be evidence in the record from which the district court could possibly infer that Parra was a supervisor of others " (p. 18) (emphasis added). I believe this is a misstatement of Sixth Circuit law.
 
 
 69
 "It is well established in this Circuit that enhancement pursuant to Sec. 3B1.1 requires the participation of at least two culpable individuals so that leadership of some criminal enterprise or organization, however minimal, can be claimed." United States v. Schultz, 14 F.3d 1093, 1099 (6th Cir.1994) (citations omitted). See United States v. Carroll, 893 F.2d 1502 (6th Cir.1990). "But these principles do not mean that the defendant must directly employ or control a partnership or enterprise." Schultz, 14 F.3d at 1099. There was simply no requirement that an individual manage or supervise another person. The majority states this standard correctly at page 15 ("a supervisor or manager of such an activity receives a three-level enhancement"). However, the discussion then strays into an examination of whether Parra managed or supervised other persons.
 
 
 70
 At one time there was some debate about whether a Sec. 3B1.1 enhancement was appropriate absent the supervision of people. United States v. Brown, 944 F.2d 1377 (7th Cir.1991); United States v. Mares-Morlina, 913 F.2d 770 (9th Cir.1991); and United States v. Lanese, 890 F.2d 1284 (2d Cir.1989) cited by the majority, represented one view of the sentencing guidelines. However, this Circuit has consistently rejected this view, most recently in United States v. Bashara, 27 F.3d 1174, 1182-83 (6th Cir.1994). In Bashara we held that "[t]o be a manager, a defendant in a drug conspiracy need not control or manage the activities of the co-conspirators--it is sufficient that the facts show that the defendant managed the criminal activity." United States v. Bashara, 27 F.3d 1174, 1182-83 (6th Cir.1994) (emphasis added) (quoting United States v. Lawrence, 918 F.2d 68, 72 (8th Cir.1990)). See United States v. Paulino, 935 F.2d 739, 757 (6th Cir.), cert. denied, 112 S.Ct. 315 (1991). See also United States v. Paz, 927 F.2d 176 (4th Cir.1991); United States v. Russell, 913 F.2d 1288 (8th Cir.1990); United States v. Johnson, 906 F.2d 1285 (8th Cir.1990). Therefore, the majority's reliance on Brown, Mares-Morlina, and Lanese, while persuasive in the absence of any direct authority from this Circuit, is misplaced. The opinions of other Circuits do not bind this court in the face of clear precedent from within the Circuit.
 
 
 71
 The district court was correct in examining the record to determine whether Parra managed the criminal activity, not whether he merely supervised other persons, though he may well have done both. For the foregoing reasons, I concur in the opinion of the court, except for the reasoning employed to reverse the Parra's enhancement in Section VIII.2 of the majority opinion. As to this issue, I concur only in the result.
 
 
 
 [1]
 21 U.S.C. Sec. 841(b) prescribes the criminal sentences that must be imposed for certain types of federal drug offenses. Thus, for example, persons responsible for more than five kilograms of cocaine receive a minimum sentence of ten years. The statute does not indicate, however, how a court should determine the amount of cocaine for which a person should be held responsible. In light of this vacuum, the standard set out in the Guidelines for determining that amount controls
 
 
 [2]
 From our review of the record, "the home" could be one of two places. Either it is the house which Paul Davis rented where Brian Davis saw Parra with seven kilograms of cocaine, J-A at 615, or it is Tyrone Wilkinson's house, where Parra sometimes dropped off cocaine. J-A at 742-43. In either case, there is no indication that Parra "controlled" these homes