**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Richard E. TOMLINSON,**
**Defendant–Appellant.**

No. 99–6022.

United States Court of Appeals,
Sixth Circuit.

April 11, 2001.

Before COLE and GILMAN, Circuit Judges; BORMAN, District Judge.*

OPINION

GILMAN, Circuit Judge.

Richard E. Tomlinson pled guilty to conspiracy to commit mail fraud in violation of 18 U.S.C. § 371. The district court sentenced him to serve 27 months of imprisonment, to serve 3 years of supervised release, and to pay $4 million in restitution to the victims of the mail-fraud scheme. Tomlinson appeals his sentence, claiming that the district court erred in attributing $4.1 million of the loss to him, by ordering him to pay $4 million in restitution, by increasing his Sentencing Guideline offense level as a result of characterizing Tomlinson as a "leader" or "organizer" of the fraudulent scheme, and by failing to decrease his offense level to reflect his "extraordinary good deeds." For the reasons set forth below, we AFFIRM Tomlinson's sentence with respect to the district court's loss calculation, enhancement for Tomlinson's role in the scheme, and decli-

nation to downwardly depart for his good deeds, but VACATE and REMAND for reconsideration the court's order that he pay $4 million in restitution.

## I.  BACKGROUND

This case arises from a fraudulent cattle-investment scheme "whose cows never came home." Tomlinson, a resident of Charlotte, North Carolina, was one of four defendants prosecuted as a result of their involvement in the scheme. The others were Gary L. Rose, who owned a cattle-breeding business located in Brentwood, Tennessee known as Brentwood Farms, Inc., and C. Tim Hodge and his brother Carlos R. Hodge, who jointly controlled C. Hodge and Associates, Inc., an investment firm with offices in Burlington and Charlotte, North Carolina.

Rose incorporated Brentwood Farms in 1971 as a business to maintain and sell Angus cattle for investors. In the early 1980s, Rose set up several cattle-investment programs that were designed to take advantage of then-existing tax laws. Major changes to the federal income-tax laws in 1986, however, substantially reduced the tax incentives that favored Rose's programs. As a result, several investors withdrew their investment. This caused Rose to conceptualize new plans to finance his cattle operations due to cash-flow problems.

In the summer of 1987, Rose met with Tomlinson and Tim Hodge and told them about his cattle-investment operations. Both Tomlinson and Hodge were then working for the Pinnacle Investment Group located in Charlotte, North Carolina. Tomlinson subsequently recommended to Pinnacle that it market limited

* The Honorable Paul D. Borman, United States District Judge for the Eastern District of Michigan, sitting by designation.

partnerships in Brentwood Farms's cattle ventures, which it did. Rose approached Tomlinson later in 1987 to enlist Tomlinson's participation in a new revenue-generating proposal involving Brentwood Farms that would raise money to support the overseas expansion of the business. According to Rose's plan, Tomlinson would stimulate corporate interest in the cattle-expansion program and sell genetically superior cattle to governments and industries abroad. Rose also asked Tim Hodge to join the proposed commercial enterprise, engaging him to sell personal notes to raise money.

Tomlinson traveled to Brentwood, Tennessee in March of 1988 to meet with Rose and Ken Campbell, Rose's lawyer, to discuss the revenue plan. Campbell explained to Tomlinson that Rose intended to sell Individual Retirement Account (IRA) notes to individual investors. The notes would be issued in Rose's name rather than in the name of Brentwood Farms. This structure, according to Campbell, would constitute personal debt and thereby avoid the violation of any securities laws. Outlining the structure of the deal, Campbell said that he would act as the trustee for the personal notes, which would be secured by Rose's stock ownership in Brentwood Farms. Campbell assured Tomlinson that the revenue-raising scheme was legal and that the assets of Brentwood Farms were solid.

Once the scheme was underway, Rose was responsible for farm operations, Tim Hodge and his brother Carlos Hodge sold Rose IRA Notes to individual investors, and Tomlinson pursued institutional financing. The Hodges recruited at least two other brokers to sell the Rose IRA Notes. Tomlinson incorporated Brookfield Investment Corporation in 1988. Its primary purpose was to raise money for Brentwood Farms. Brookfield Invest-

ment's main office was in Charlotte, North Carolina, but it opened a second branch within the offices of Brentwood Farms in Tennessee. Rose and Tomlinson decided to sell the Rose IRA Notes to the public through Brookfield Investment. In fact, the letter of credit that was obtained in 1987 from American Bancorp Mortgage Company to secure the scheme was issued to that business.

Rose and Tomlinson were closely involved in the operations of each other's corporations. In the summer of 1988, Campbell and Rose traveled to Charlotte to meet with Tomlinson. At that meeting, Campbell and Rose offered Tomlinson 50% stock ownership in Brentwood Farms to compensate Tomlinson for his efforts in seeking institutional support for the Rose investment program. Tomlinson accepted the stock initially, but relinquished his ownership within one week because of rumors about Brentwood Farm's liability to prior creditors. For his part, Rose became a one-half owner in Brookfield Investment in 1988.

Tomlinson was instrumental in causing Lawrence Leafer, a self-employed attorney in Charlotte who was also a friend of Tomlinson, to become the substitute trustee for the Rose IRA Notes. Leafer went to Brentwood in 1988 to meet with Rose, Campbell, and John Rudolph, the primary manager of Brentwood Farms's cattle operation. Campbell told Leafer that he had a conflict of interest and needed to relinquish his position with the Rose trust. The trust, Campbell explained, had two purposes. First, it held the letter of credit for the protection of the Rose IRA Note investors. Second, the trust held a security interest in the assets of Brentwood Farms. Leafer agreed to assume the role of trustee.

There were several problems with the Rose IRA Notes. First, Internal Revenue

Service (IRS) regulations require IRS approval of a trustee before the sale of IRA notes to the public can commence. *See* 26 C.F.R. §§ 1.408–2(b), 1.408–2(e). Thus, the appointment of Leafer as "trustee" without IRS approval was not sufficient to comply with the regulations. In January of 1989, Brookfield Investment applied to the IRS to act as the trustee for the Rose IRA Notes. But the IRS advised Brookfield Investment on or about May 10, 1989 that the application was deficient, because Brookfield Investment had not complied with several requirements of the IRS regulations. On or about August 14, 1989, Brookfield Investment received an IRS letter stating that the IRS would close its consideration of Brookfield Investment's application unless it received additional information within ten days. Brookfield Investment did not respond to the IRS's notice. On or about August 28, 1989, Brookfield Investment received a formal letter from the IRS denying its application to become an authorized trustee for the Rose IRA Notes. Rose, Tomlinson, and the Hodges discussed the IRS denial of authorization, but agreed to continue selling the Notes as IRA investments despite the denial. They never disclosed their unauthorized status to the purchasers of the Notes.

Second, the proceeds from the sale of the Rose IRA Notes were used to fund the cattle-breeding operations of Brentwood Farms. Because Brentwood Farms did not generate sufficient revenue to make the principal and interest payments owed to the purchasers of the Notes, the sale of these Notes turned into a Ponzi scheme. The Hodges and their two associates gave the proceeds from their Rose IRA Note sales to Brookfield Investment. Florence Misseri, Tomlinson's secretary at the Brookfield Investment office, deposited these payments directly into an escrow account in Rose's name at the North Car-

olina National Bank in Charlotte. Rose then instructed Tomlinson to transfer the funds to one of several accounts in the name of Rose, Brookfield Investment, or C. Hodge and Associates. Rose used these funds to make the principal and interest payments to earlier Rose IRA Note purchasers. He also used some of this revenue to repay personal debts and business-judgment lienholders in other Brentwood Farms operations. These facts were not disclosed to the purchasers of the new Rose IRA Notes that the Hodges and their associates were selling.

Finally, American Bancorp was in bankruptcy when it signed the letter of credit that Campbell and Rose procured in 1987. The record reveals that Tomlinson learned of American Bancorp's Chapter 11 bankruptcy petition by fax on August 22, 1988. American Bancorp defaulted on its letter of credit shortly after Rose defaulted on the Notes sometime in the summer of 1991.

Rose contacted Leafer on June 5, 1991 to give notice of his default on the Rose IRA Notes. Leafer then attempted to contact American Bancorp and learned that its letter of credit was a fraud. Faced with American Bancorp's default, Leafer raised approximately $2 million by liquidating the assets of Brentwood Farms. This sum was first used to pay the priority liens on Brentwood Farms. Leafer discovered the magnitude of the sham during the liquidation process. He learned that Brentwood Farms had seriously misrepresented the number, age, and reproductivity of its cattle. Furthermore, Leafer learned about Rose's use of the proceeds of the Note sales at this time.

In November of 1991, Tomlinson was in Europe for meetings with the Hungarian government to negotiate a large-scale contract to sell genetically superior cattle.

Rose called Tomlinson on November 30, 1991 and informed him that Brentwood Farms was a sham. He nevertheless encouraged Tomlinson to conclude the deal for the sale of cattle, semen, and breeding services with the Hungarian government in order to raise revenue for the repayment of Brentwood Farms's obligations under the Rose IRA Notes. Leafer also advised Tomlinson to continue to pursue the Hungarian contract. Despite Tomlinson's efforts, the negotiations failed.

Although Tomlinson acknowledges his participation in the fraudulent investment scheme and entered a plea of guilty to the count of conspiracy to commit mail fraud in violation of 18 U.S.C. § 371, he maintains that he was largely ignorant of the scheme's illegal nature. He says that he trusted Campbell's representation in 1988 that selling the IRA Notes in Rose's name was legal. Furthermore, he claims that he never knew that American Bancorp was bankrupt until the scheme collapsed, or that Brentwood Farms had misrepresented the truth about its operations and financial condition.

The district court, however, found to the contrary. It concluded that Tomlinson and Rose had become partners in organizing Brookfield Investment as the clearinghouse for the sale of the Rose IRA Notes. The court also determined that Tomlinson knew about American Bancorp's bankruptcy long before 1991. Furthermore, it found that Rose knew from the inception of the Rose IRA Note scheme that any sale of IRA notes without authorization from the IRS was illegal. The district court finally determined that Rose, Tomlinson, and the Hodges all participated in the decision to continue selling the Rose IRA Notes after they received notification from the IRS in August of 1989 that they were not authorized to do so.

Sometime in late 1988 or early 1989, Rose consulted with Gary Lewis, an accountant with Brentwood Farms, asking him what steps would be necessary to obtain trustee status to administer IRA investments. Lewis arranged to have pertinent information faxed to Rose's office. Rose later mentioned to Lewis that Brookfield Investment was pursuing IRA trustee status. Lewis responded by telling Rose that he did not think that Brookfield Investment would qualify under the IRS regulations. When Lewis eventually learned that Rose had proceeded to sell the Rose IRA Notes anyway, Lewis informed Rose that he should not continue doing so without gaining approval by the IRS. Special Agent McFarland interviewed Rose and testified at the sentencing hearing that Rose acknowledged sharing Lewis's opinion with Tomlinson. This fact was not mentioned in the Presentence Investigation Report (PSR) findings.

In any event, Tomlinson had consulted with his own attorney in Charlotte, W. Bradley Blair, II, about the proposed Rose IRA Note scheme. Blair wrote in a letter to Tomlinson dated August 2, 1988 that he had serious concerns that the scheme would expose Tomlinson to potential liability under state and federal securities laws. The letter went so far as to suggest remedial measures that Tomlinson could take to extract himself from the scheme and to rectify the situation vis-a-vis the investors. Tomlinson acknowledged receiving this letter, but insisted that his attorney's comments did not advise him that the sales were illegal. Rather, he maintained that he relied on Campbell's assurances that the structure of the Rose IRA Note scheme was legally sound.

In conclusion, the district court found that the scheme defrauded about 227 investors in North Carolina. Approximately $2.2 million in funds were fraudulently ob-

tained from the sale of the Rose IRA Notes prior to the receipt of the IRS's final denial of the trustee application on or about August 28, 1989. A further $1.9 million was fraudulently obtained between August 28, 1989 and July 26, 1991. The government also showed that the conspirators obtained an additional $4.1 million from the sale of conventional investment notes from 1988 through July of 1991.

Most of the victims recovered about one-half of the savings that they had invested in the Rose IRA Notes through the settlement of a civil suit against the brokerage firm that employed the Hodges during the time they were selling the Notes. Tomlinson offered evidence at the sentencing hearing that $789,515 was paid from the Rose accounts to the investors in North Carolina between 1988 and 1991. This amount was not accounted for in the PSR. Tomlinson argues that this sum should be deducted from the total amount of loss. The government responds that this amount reflects regular interest payments that were due to the investors and therefore does not account for the lost principal that the investors paid.

Tomlinson entered his guilty plea on April 14, 1997. After the PSR was prepared, the district court held sentencing hearings in May of 1998 and considered post-hearing Proposed Findings of Fact and Conclusions of Law submitted by both parties. The district court entered an order and an accompanying memorandum in May of 1999 that set forth its findings on Tomlinson's responsibility for the amount of loss and his role in the conspiracy. On June 17, 1999, it held a final sentencing hearing where it formally adopted the factual findings and guideline recommendations contained in the PSR. Consequently, it sentenced Tomlinson to 27 months of incarceration, imposed 3 years of supervised release, and ordered him to pay $4

million in restitution for the losses incurred by the victims of the fraudulent scheme.

Tomlinson filed a timely appeal. He claims that the district court erred in holding him responsible for $4.1 million in losses, arguing that it erroneously included losses prior to the time that the IRS denied authorization in August of 1989 for him, Rose, and the Hodges to sell the Rose IRA Notes. For this and other reasons, he argues that the district court further erred by ordering him to pay $4 million in restitution. He also claims that the district court erred by increasing his base offense level for his alleged role as a leader and organizer of the conspiracy. To the contrary, he argues that he held no decision-making role in the scheme. Finally, he claims that the district court erred in denying his motion for a downward departure from his offense level because of the "extraordinary good deeds" that he has performed in his community.

## II.  ANALYSIS

### A.  The district court did not err in attributing $4.1 million in loss to Tomlinson

Tomlinson first contends that the district court erred by attributing $4.1 million in loss to him. Two consequences flowed from this finding by the district court. First, Tomlinson's offense level was increased by 13 levels, based on the loss calculation that exceeded $2.5 million. Second, the district court ordered Tomlinson to pay $4 million in restitution to the victims of the fraudulent scheme. (Both parties acknowledged at oral argument that the discrepancy between the $4.1 million loss calculation and the $4 million restitution order was simply a clerical error by the district court.)

■  The loss calculation is a factual determination that will not be set aside un-

less we conclude that it is clearly erroneous. *See United States v. Comer,* 93 F.3d 1271, 1285 (6th Cir.1996). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Gort–DiDonato,* 109 F.3d 318, 320 (6th Cir.1997) (internal quotation marks and citations omitted).

Tomlinson makes three arguments regarding the loss figure. First, he contends that $2.2 million should be deducted because this was the amount of proceeds gained from the sale of the Rose IRA Notes prior to August 28, 1989, when Tomlinson claims that he first learned that the scheme was illegal. Second, he argues that $789,515 actually paid to the investors from 1988 to 1991 should be deducted from the total loss figure. Finally, he claims that an additional $100,000 should be deducted from the total loss, reflecting the amount of money from his personal funds that he used to make payments to the investors.

■ Turning to Tomlinson's first argument, he claims that $2.2 million in proceeds from the sale of Rose IRA Notes prior to August 28, 1989 should not be included in the loss because he did not know that his actions were illegal until the IRS informed Brookfield Investment on that date that it was not authorized to sell IRA notes. The record, however, reveals that even if no accountant or attorney expressly told Rose or Tomlinson that their investment scheme was illegal, both of them had received sufficient warnings that they could face potential liability and should take further action to ensure the legality of their enterprise. As a result, it cannot be said that the district court clearly erred in finding that Tomlinson knew the investment scheme was illegal from its

inception and should therefore be liable for the entire loss incurred by the IRA investors.

■ According to Tomlinson's next argument, the district court erred by failing to deduct $789,515 that he claims was paid to the investors between 1988 and 1991. We first note that the district court failed to make a finding with regard to this claimed deduction. Nevertheless, the government persuasively argues that this amount consisted of routine payments of interest that were due on the Rose IRA Notes. Under the Sentencing Guidelines, "loss is the value of the money, property, or services unlawfully taken; it does not, for example, include interest the victim could have earned on such funds had the offense not occurred." U.S. Sentencing Guidelines Manual § 2F1.1 cmt. n. 8. Because interest is not included in calculating loss, so too should payments of interest not be deducted from the principal owed. Although the government failed to cite the record to document its contention that the $789,515 in payments made by Brentwood Farms prior to 1991 were interest payments, Tomlinson has not rebutted the government's position. As a result, Tomlinson's claim regarding the $789,515 lacks merit.

■ Tomlinson's final argument on the loss calculation—that the district court failed to deduct $100,000 of the personal expenses that Tomlinson purportedly spent to make payments once he learned that the scheme was unraveling—is similarly without merit. Testimony that Tomlinson used personal expenditures to salvage the scheme appears only once in the record. Responding to a question asked during direct examination at the sentencing hearing, "Did you spend any of your personal monies to try to make restitution or repay anybody," Tomlinson said, "I used about a hundred thousand dollars,

which is the end of my money, trying to make this thing somehow, some way come together." This isolated assertion without further evidence is an insufficient basis for this court to find clear error in the district court's loss calculation.

B. The district court erred in ordering Tomlinson to pay $4 million in restitution without further analysis on the record

At oral argument, Tomlinson's counsel contended that the district court mistakenly believed that it was required to issue a restitution order pursuant to the Mandatory Victims Restitution Act of 1996, set forth in 18 U.S.C. §§ 2248 and 3663A. The PSR, however, clearly informed the district court that the payment of restitution was not mandatory: "It should be noted that payment of restitution could be ordered by the Court but was not mandatory by statute at the time the instant offense was committed. Thus, it appears the Court has discretion with regard to ordering restitution." This passage clearly establishes that the PSR left the issue of restitution to be determined by the district court.

The PSR also detailed Tomlinson's financial capabilities. It pointed out that, given Tomlinson's educational background and employment history, he should be able to secure gainful employment upon his release from custody and has sufficient earning potential to pay some form of restitution. Prior to Tomlinson's conviction and incarceration, he reported an annual income of around $155,000 on his tax return in 1996. In 1995, however, Tomlinson filed for Chapter 13 bankruptcy in the United States Bankruptcy Court for the Western District of North Carolina. The bankruptcy court formulated a one-month payment plan and discharged him in October of 1995.

Despite Tomlinson's bankruptcy filing, the PSR concluded that in light of the extensive loss to the victims, many of whom were elderly retired individuals, the district court should order some form of restitution, as well as the payment of $10,000 within 30 days of sentencing based upon Tomlinson's financial resources at that time. It also recommended as a special condition that the defendant should pay restitution jointly and severally with Rose and the Hodges.

██ Tomlinson argues that the district court erred in ordering him to pay $4 million in restitution, given that he filed for bankruptcy in 1995 and that he does not have the present means to pay that amount. The PSR acknowledged that Tomlinson had filed for bankruptcy, but concluded that Tomlinson has sufficient earning potential to pay some amount of restitution. It left the imposition and amount of restitution to the discretion of the district court. Tomlinson never argued before the district court that he would be incapable of paying any restitution. Because Tomlinson failed to object to the imposition of $4 million in restitution at sentencing, we can only set aside the district court's order for plain error. *See United States v. Bondurant*, 39 F.3d 665, 668 (6th Cir.1994) (reviewing the district court's restitution order for plain error because the defendant failed to object to the court's order of restitution at the sentencing hearing).

The statute governing restitution in effect at the time of Tomlinson's offense, 18 U.S.C. § 3663(a)(1)(A), allows for the discretionary imposition of a restitution order. A district court must take the following factors into consideration when determining whether to order restitution: "(I) the amount of the loss sustained by each victim as a result of the offense; and (II) the financial resources of the de-

fendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate." 18 U.S.C. § 3663(a)(1)(B)(i).

■ Although a defendant's present lack of funds will influence the amount of any *fine* imposed, a district court may evaluate a defendant's future earning potential when using its discretion to determine whether to order a defendant to pay *restitution*. *See United States v. Sanders*, 95 F.3d 449, 456 (6th Cir.1996) ("A district court may order restitution even if it finds that the defendant cannot pay a fine, if the court finds that the defendant has a substantial probability of earning future income.").

The district court's decision fails to set forth its reasons for setting Tomlinson's restitution obligation at $4 million. In *Sanders*, this court determined that the lack of specific findings regarding the statutory factors indicated that the district court may not have considered all of the required factors. *See id.* at 456. As a result, the court vacated the district court's restitution order and remanded the case for resentencing, instructing the district court to determine whether to order restitution in light of the statutory factors listed. *See id.*

■ The question before us is whether this case warrants a remand as in *Sanders*, given the lack of explanation provided by the district court. Because we are reviewing the district court's restitution order for plain error, however, this issue is a close one. "To establish plain error, a defendant must show (1) that an error occurred in the district court; (2) that the error was plain, *i.e.*, obvious or clear; (3) that the error affected defendant's substantial rights; and (4) that this adverse impact seriously affected the fairness, integrity or public reputation of the judicial proceed-

ings." *United States v. Koeberlein*, 161 F.3d 946, 949 (6th Cir.1998).

On the one hand, Tomlinson did not address this issue when responding to the PSR and failed to object to the district court's restitution order. He therefore presented no additional proof in mitigation of the restitution order. *See* 18 U.S.C. § 3664(e). On the other hand, the PSR included detailed findings of his financial situation and earning capacity, from which we can presume a gross annual income of no more than $150,000, based on the earnings reported on his 1996 income tax return. After deducting reasonable living expenses and applicable income taxes, the district court could easily have concluded that Tomlinson would be incapable of ever repaying the full amount of $4 million in restitution.

Tomlinson urges us to follow this court's decision in *United States v. Dunigan*, 163 F.3d 979 (6th Cir.1999), and vacate the district court's restitution order. In *Dunigan*, the district court ordered an indigent defendant to pay $311,605 within the three-year period of his supervised release. *Id.* at 981. This court held that the district court abused its discretion in ordering the restitution, stating: "[W]e hold that a district court must have, at a minimum, some indication that a defendant will be able to pay the amount of restitution ordered in order to comply with 18 U.S.C. § 3664(a)." *Id.* at 982. *But see United States v. Adams*, 214 F.3d 724, 730 (6th Cir.2000) (holding that *Dunigan* did not mandate the reversal of a restitution order for a defendant who was ordered to pay $23.890 in restitution).

Even though we are reviewing Tomlinson's restitution order under the heightened standard of plain error, we conclude that the district court did plainly err in ordering that Tomlinson pay $4 million in

restitution without further explanation. First, the district court failed to determine whether Tomlinson is capable of paying the restitution amount. Second, it failed to consider the recommendation of the PSR to coordinate restitution payments with the others who were also indicted in this fraudulent investment scheme—namely, Rose and the Hodges. We therefore vacate the district court's order for Tomlinson to pay $4 million in restitution and remand this issue for further consideration.

C. The district court did not err in imposing a four-level enhancement for Tomlinson's role in the offense

■ Tomlinson next argues that the district court erred by increasing his offense level for his role as an "organizer" or "leader" of the fraudulent investment scheme. We will not disturb a district court's determination of a defendant's role in the offense unless we find it to be clearly erroneous. *See United States v. Schultz*, 14 F.3d 1093, 1099 (6th Cir.1994).

Under § 3B1.1 of the U.S. Sentencing Guidelines, "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," the district court is instructed to increase the defendant's offense level by an additional four levels. Tomlinson argues that he cannot be characterized as an "organizer" or "leader" for two reasons. First, he claims that he had no decision-making authority in the Rose IRA Note scheme. Second, he claims that the only person he "supervised" throughout his involvement in the whole scheme was Florence Misseri, his office manager at Brookfield Investment. Although Tomlinson concedes that he was an "essential element" in Rose's fraudulent scheme, he denies that he can be fairly characterized

as an organizer or leader of that scheme for the purposes of § 3B1.1.

The PSR concluded that an upward adjustment was warranted for Tomlinson's role in the offense under the theory outlined in comment 3 to § 3B1.1. This comment provides as follows:

> In assessing whether an organization is "otherwise extensive," all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.

U.S. Sentencing Guidelines Manual § 3B1.1 cmt. n. 3. The application notes to § 3B1.1 give further guidance as to its conception of an "organizer" or "leader:"

> In distinguishing a leadership and organizational role from one of mere management or supervision ... [,] the court should consider ... the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, ... [and] the degree of control and authority exercised over others.

U.S. Sentencing Guidelines Manual § 3B1.1 cmt. n. 4. "To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." U.S. Sentencing Guidelines Manual § 3B1.1 cmt. n. 2. Our circuit has interpreted § 3B1.1 to mean that where the other factors are present and "the defendant exerts control *over at least one participant* in a supervisory, managerial, leadership, or organizational capacity, a sentence enhancement is required under § 3B1.1." *Gort–DiDonato*, 109 F.3d at 321 (emphasis added).

The PSR made the following factual finding regarding the enhancement for Tomlinson's role in the offense:

> Based on the government's investigation, the defendant appears to have been an organizer or leader of a criminal activity involving four known participants. The "unknowing services" of several other individuals also were used. Accordingly, Mr. Tomlinson was involved in a criminal activity that was otherwise extensive as defined in Application Note 3 of § 3B1.1.

Given the entire factual circumstances of the fraudulent investment scheme, the district court's decision to raise Tomlinson's offense level for his role in the scheme was not clearly erroneous. Tomlinson's organization of Brookfield Investment to serve as a clearinghouse for the sale of the Rose IRA Notes is a clear sign of a leadership or organizational role, even if the original idea behind the plan came from Rose. Furthermore, Tomlinson played an instrumental role in recruiting Leafer as trustee for the Rose IRA Notes. Special Agent Scott McFarland also testified at the sentencing hearing about a number of others who provided "unknowing services" to this operation. Although these people were direct employees of C. Hodge and Associates or Brentwood Farms, their role in facilitating the illegal operation nevertheless made the organization "otherwise extensive." Finally, the record shows that Tomlinson participated in reaching the decision to continue selling the Rose IRA Notes even after the IRS had informed Brookfield Investment that selling the notes without authorization from the IRS was illegal. Accordingly, we find no error in the district court's four-level upward adjustment of Tomlinson's offense level as a result of his role in the offense.

### D. The district court's decision to deny Tomlinson's motion for a downward departure is not reviewable

██ Finally, Tomlinson claims that the district court erred by denying his motion for a downward departure, based on his "lifelong commitment to community service" and his "extraordinary good deeds ." He urges that 18 U.S.C. § 3553(b) and U.S. Sentencing Guidelines Manual § 5K2.0 give the sentencing court discretion to depart from the sentencing range established by the applicable guidelines when "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission."

██ Generally, we do not review a district court's failure to exercise its discretion to grant a downward departure. *See United States v. Coleman,* 188 F.3d 354, 357 (6th Cir.1999) (en banc). An appellate court, however, may review a district court's denial of a motion to downwardly depart "if the district court judge incorrectly believed that [s]he lacked any authority to consider defendant's mitigating circumstances as well as the discretion to deviate from the guidelines." *Id.* (internal quotation marks and citation omitted).

Tomlinson argues that the district court incorrectly believed that it lacked the authority to consider Tomlinson's mitigating circumstances because it denied his motion without giving any explanation. He also claims that the government's statement at the sentencing hearing that Tomlinson's good deeds were "not a basis for departure" further proves his point that we can review the district court's failure to depart. As a result of these factors, Tomlinson claims that we should review his claim for a downward departure de novo.

To the contrary, the record shows that the memorandum opinion of the district court sufficiently entertained Tomlinson's arguments. The memorandum first summarizes Tomlinson's position. It then proceeds to cite the government's arguments, which point out that charitable contributions and public service are ordinarily not relevant in determining whether to depart downward. *See* U.S. Sentencing Guidelines Manual § 5H1.11 ("Military, civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range."). Furthermore, the district court noted that Tomlinson failed to cite any legal authority for his position.

We conclude from our review of the record that the district court was aware of its authority to grant a downward departure, and simply declined to exercise its discretion. This is true despite the fact that the district court did not explicitly acknowledge that it had discretion to grant Tomlinson's motion. *See United States v. Moore,* 225 F.3d 637, 643 (6th Cir.2000) ("[T]he district court is not obligated to state that it knows it has the discretion to depart downward but is declining to do so, as it should be assumed, that the court, in the exercise of its discretion, found downward departure unwarranted.") (internal quotation marks and alterations omitted). We therefore find no basis to review the district court's denial of Tomlinson's motion for a downward departure.

## III. CONCLUSION

For all of the reasons set forth above, we VACATE and REMAND the district court's order that Tomlinson pay $4 million in restitution for further consideration consistent with this opinion, but AFFIRM all of the other elements of Tomlinson's sentence.