**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jairo MARTINEZ, Defendant–Appellant.**

**No. 97–2111.**

United States Court of Appeals, Sixth Circuit.

Argued May 24, 1999.

Decided and Filed June 23, 1999.

John C. Engstrom (argued and briefed), Office of U.S. Atty., Detroit, MI, for Plaintiff–Appellee.

C. Mark Pickrell (argued and briefed), Nashville, TN, for Defendant–Appellant.

Before: KENNEDY, CONTIE, and RYAN, Circuit Judges.

## OPINION

CONTIE, Circuit Judge.

Defendant-appellant, Jairo Martinez, appeals the sentence the district court imposed on him after he was convicted of a drug trafficking offense, contending that his sentence should not be enhanced pursuant to U.S.S.G. § 3B1.1(c). For the following reasons, we affirm the district court.

### I.

On August 28, 1996, in Redford, Michigan, Charles Malone was stopped for a traffic offense and arrested for possession of the drugs which were found after a search of the car. Charles Malone told the Redford Township Police that he had just received the drugs from a Colombian living in New Jersey named Jairo Martinez, the defendant herein. The police officers seized from Malone approximately 235 grams of heroin. Malone told the police that he had received the heroin from Martinez, who was accompanied by his brother Jaime Martinez, at the Hilltop Hotel in Redford. Malone told the police that when he was stopped by them, he was on his way to get approximately $8,000 for Martinez as partial payment of money owed to Martinez for purchased heroin.

Charles Malone agreed to become a confidential informant ("CI"), and he assisted the Redford Police and then the federal Drug Enforcement Agency ("DEA") in their pursuit of defendant Martinez.

Malone's relationship with Martinez had developed in the following way. When Malone was in prison in Michigan in 1991 or 1992, he met a Colombian, David Ospina. After serving his prison sentence, Ospina was deported back to Colombia and began exporting heroin to the United States. He used Malone to distribute some of the heroin for him.

In May 1996, Ospina, who was in Colombia, asked Malone to finance a trip for defendant from Colombia to the United States. Malone obliged and wired approximately $2,500 to cover defendant Martinez's expenses. After Martinez came to the United States, Malone made two drug purchases from defendant. On July 9–10, 1996, Malone purchased approximately 200–250 grams of heroin from Martinez at the Hilton Gateway and Towers Hotel in Newark, New Jersey for about $20,000. Defendant Martinez gave this heroin, which was flown into the United States from Colombia via private aircraft, to Malone on consignment and told him how to pay for the heroin by wiring money to New Jersey. On August 8, 1996, Malone wired a total of $10,000 in four separate wire transfers to two different persons in New Jersey. On August 14, 1996, Malone met with defendant Martinez at the Econo Lodge Motel in Southfield, Michigan. Ma-

lone paid off some of his former heroin transaction and purchased another 225 grams of heroin from Martinez. Martinez told Malone how he could pay for the heroin by sending money orders to various people in New Jersey. Six wire transfers to different persons totaling $10,000 were made between August 18, 1996 and August 27, 1996.

When Malone met with Martinez for the final time on August 28, 1996, Martinez was with his brother. Martinez delivered approximately 235 grams of heroin to Malone, and Malone left to get money to pay Martinez. It was while he was going to get the money that Malone was arrested by the Redford Police and became a CI.

After being arrested, Malone cooperated with the DEA and continued to wire money to Martinez. Under the supervision of DEA agents, Malone participated in several taped telephone conversations with Martinez in which they discussed wire transfers and future deals. Malone attempted to introduce undercover agent James Doby as his nephew, who could assist in the heroin distribution. However, after three conversations with Agent Doby, Martinez appeared to become suspicious and quit returning pages.

On September 3, 1996, Malone telephoned Martinez under the supervision of DEA agents to discuss money transfers. Martinez then sent a fax to a DEA undercover fax machine listing people to whom Malone could wire money owed. The names on the list included: Agustin Molina, Juliette Betancourt, Robert F. Shackelton, Jose H. Marin, Javier Antonio Arias, Gonzalo Arias, and Jaime Martinez. Malone then wired two payments for $2,500 and $2,000 under the first two names on the list.

In another recorded conversation on September 3, 1996, Malone called Martinez to give him the control numbers for the two wire payments made earlier that day. During this conversation, Martinez told Malone that he had the "stuff" ready and for Malone to double check a name dis-

crepancy on a previous wire transfer in which monies were unable to be collected. During this telephone conversation, Martinez mentioned knowledge of at least four other wire transfers to himself, his brother, and his sister-in-law.

On September 23, 1996, Martinez was arrested by DEA agents in Patterson, New Jersey at his apartment. He consented to a search of his apartment and advised the police of the location of heroin and money in a bedroom on the second floor. There were 13.5 grams of heroin, along with $4,300 in cash. A search of the bedroom also uncovered 31 receipts for money transfers to Pereria, Colombia, and papers with names, phone numbers, and dollar amounts.

On October 10, 1996, a federal grand jury in the Eastern District of Michigan returned a two-count indictment against defendant, charging him with conspiring to possess with the intent to distribute and to distribute heroin in violation of 21 U.S.C. § 846, and distribution of heroin in violation of 21 U.S.C. § 841(a)(1). Following a three-day trial, on April 10, 1997, the jury returned guilty verdicts against defendant on both counts of the indictment.

A presentence report was prepared which recommended that defendant receive a three-level enhancement to his base offense level for his role in the offense as a "manager" or "supervisor" in a criminal activity involving five or more participants under U.S.S.G. § 3B1.1(b). Defendant objected to the enhancement.

At the sentencing hearing, the district court declined to impose a three-level enhancement under section 3B1.1(b), because the court was not sure if there were five or more people involved in the conspiracy. The court instead imposed a two-level enhancement, finding that defendant was an organizer, leader, manager, or supervisor in a criminal activity under section 3B1.1(c). The district court sentenced defendant to a term of 112 months on each

count to run concurrently. Defendant filed a timely notice of appeal.

## II.

We must decide whether the district court erred in concluding that defendant played an aggravating role in the offense as an organizer, leader, manager, or supervisor pursuant to U.S.S.G. § 3B1.1(c).

Section 3B1.1 of the Sentencing Guidelines provides:

Based on the defendant's role in the offense, increase the offense level as follows:

(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

(c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

The Sentencing Guidelines, including the relevant commentary, do not attempt to define the terms "organizer," "leader," "manager," or "supervisor"; but rather set forth a number of factors that the court should consider. They include: (a) the exercise of decision-making authority; (b) the nature of participation in the commission of the offense; (c) the recruitment of accomplices; (d) the claimed right to a larger share of the fruits of the crime; (e) the degree of participation in planning or organizing the offense; (f) the nature and scope of the illegal activity; and (g) the degree of control and authority exercised over others. U.S.S.G. § 3B1.1 Application Note 4.

 The United States has the burden of proving the enhancement by a pre-

ponderance of the evidence. *United States v. Castro,* 908 F.2d 85, 90 (6th Cir. 1990). This court's factual findings on this issue, however, are reviewable for clear error only. *United States v. Washington,* 127 F.3d 510, 515 (6th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 2348, 141 L.Ed.2d 2718 (1998); *United States v. Schultz,* 14 F.3d 1093, 1099 (6th Cir.1994).

 Defendant contends that the district court erred in enhancing his sentence under U.S.S.G. § 3B1.1(c) because the record indicates that defendant was merely a delivery person for the Colombian, Ospina, and a conduit for collections. Defendant contends that as a mere distributor, he was ineligible for the guideline enhancement because he was a middleman, not an organizer, supervisor, leader, or manager. He argues that the relationship between Ospina and Malone was established before he ever came to the United States. Defendant relies on *United States v. Gort–DiDonato,* 109 F.3d 318 (6th Cir.1997), in which this court held that the crucial question in determining whether enhancement pursuant to section 3B1.1 should apply is whether the defendant exercised control over other conspirators. Defendant argues that in the present case there is no evidence that he exercised control over anyone and that he merely collected money.

The United States argues that, to the contrary, the record establishes that defendant Martinez was the point person within the United States for the heroin trafficking of the fugitive Colombian drug trafficker, Ospina. The government argues that in addition to distributing heroin on behalf of Ospina in the United States, he organized a scheme to collect United States drug debts on behalf of Ospina, periodically wiring the collected money to Ospina in Colombia. The government argues that at the time of his arrest and the search of his residence, Martinez admitted that he was responsible for collecting money from various unnamed people and forwarding it to Ospina in Colombia. The

government argues that Martinez recruited accomplices and implemented a fairly complicated procedure of wire transfers for the collection of heroin debts for Ospina, and that this conduct was sufficient for imposing a two-level enhancement pursuant to U.S.S.G. § 3B1.1(c).

We agree based on the following evidence. In the course of collecting drug debts on behalf of Ospina, defendant Martinez instructed informant Charles Malone to wire money to various individuals in New Jersey. Government Exhibit 26 presents a list of seven names that Martinez asked Malone to use for wiring money to New Jersey, and it was established at trial that Malone wired money to the following persons in New Jersey: (1) Jairo Martinez; (2) Gonzalo Arias; (3) Jaime Martinez (defendant's brother); (4) Miryan Gonzales; (5) Agustin Molina; (6) Juliette Bentancourt; (7) Robert Shakelton, and (8) Clara Arias. In a tape recorded conversation with the CI, defendant made it clear that people other than himself were picking up the wire transfers in New Jersey. There is also evidence that defendant wired the money collected from these wire transfers to Ospina in Colombia, and that in so doing, he enlisted the assistance of other individuals in New Jersey. For instance, Exhibit 16a is a wire transfer receipt from Jairo Martinez to Blanco Alvarez in Colombia, and Exhibit 16b is a wire transfer receipt from Gonzalo Arias to Aleyda Ramos. It is clear on the face of these documents that two different individuals filled them out so it appears that Martinez enlisted the aid of Gonzalo Arias to complete at least one money transfer to Colombia. Wire receipts discovered during the search of Martinez's apartment showed that he had wired $26,550 to various persons in Pereria, Colombia between July 7, 1996 and September 19, 1996.

Based on this evidence, the district court stated the following:

Based on this record I think it's clear that this defendant was an organizer and a key player in all of this. He was advising others, he was making everything in the United States happen. Once the drugs arrived here, it was his deal. He distributed or found persons who did.

He was collecting money. He was selling. He was getting it back to people in Colombia. He was the most active of any of them. From what I can read, somehow supplied the heroin from then on.

It was this named defendant who made it all happen in the United States. He used others, he directed them in what they were to do, and he made sure the money went back to Colombia. He gets those points assessed, if you will, as an organizer and as a manager and as a supervisor.

We agree with the district court's conclusion. The facts indicate that defendant developed a fairly elaborate scheme of wiring money for the payment of drug debts to various people in New Jersey and that he had some of these people collect money for him at different stations in New Jersey. Then defendant would collect the money and wire it to Colombia, again using accomplices to assist him. There is thus evidence that Martinez recruited accomplices for the conduct of the illegal activity involved in the offense.

There is also evidence that Martinez exercised decision-making authority and that his role was integral to the commission of the offense. In addition to deciding who to recruit for the debt collection scheme, there is evidence he made decisions on whom to recruit for the distribution scheme. When the DEA agents attempted to introduce another undercover agent, James Doby, to defendant, he ultimately refused to do business with the undercover agent, apparently able to sniff him out as a possible informer quite quickly. Defendant contends that there is no evidence he exercised control over Malone and that he did not hire him as a distributor. Although defendant did not recruit Malone, it is clear that once he came to the

United States, defendant exercised control over Malone. He decided how much money to front to Malone and instructed him in the method of wire transfers of money to New Jersey. It is thus clear that defendant exercised authority in the distribution organization which perpetrated the criminal conduct in addition to mere buying and selling. *See United States v. Alred,* 144 F.3d 1405, 1422 (11th Cir.1998). In *United States v. Schultz,* 14 F.3d at 1099, this court found that organizing or coordinating an international scheme to bring contraband into a community on a continuing basis is sufficient for an enhancement pursuant to U.S.S.G. § 3B1.1 even if the defendant did not directly employ anyone or control a partnership in the enterprise. In the present case, it is clear from the evidence at trial that Martinez coordinated an international scheme which brought contraband into the Detroit community from Colombia through New Jersey for distribution on a continuing basis.[1]

Furthermore, Martinez was responsible for developing a scheme and recruiting accomplices in the collection of drug debts and forwarding the proceeds to Colombia. Application Note 2 of U.S.S.G. § 3B1.1 indicates an upward departure may be warranted even if the defendant "did not organize, lead, manage or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization." In the present case, at a minimum, Martinez exercised management responsibility over the money received from the sale of drugs in the United States for the Ospina operation.

For these reasons, defendant's argument that he was a mere middleman in an international drug distribution and collection conspiracy has no merit, and the district court did not err in assessing a two-

level enhancement pursuant to U.S.S.G. § 3B1.1(c).

The opinion of the district court is hereby **AFFIRMED**.

---

1. Defendant concedes in his brief that Malone arranged for the resale of the heroin that was brought into the Midwest.

