**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Danny BUCIO-CABRALES,**
**Defendant–Appellant.**

**No. 14–3991.**

United States Court of Appeals,
Sixth Circuit.

March 14, 2016.

---

BOGGS, Circuit Judge.

Danny Bucio–Cabrales appeals his convictions for conspiracy to distribute 1,000 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(vii), and 846, and conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 846. Bucio–Cabrales asks this court to vacate his convictions, which he argues the government obtained with the use of evidence discovered during an unconstitutional search of his residence. He also argues that his sentence is improper because the government did not provide evidence sufficient to support two sentence enhancements that he received due to his leadership role in the drug conspiracy and his possession of a dangerous weapon. For the reasons given below, we affirm Bucio–Cabrales's convictions and sentence.

I

A

In January 2013, Bucio–Cabrales and Misael Cortez–Torres moved into an apartment located at 4020 Migration Lane in Columbus, Ohio. Working under the direction of a man known only as "Pablo," Bucio–Cabrales and Cortez–Torres spent the next five months unloading, inspecting, weighing, packaging, and storing large amounts of marijuana and cocaine at 4020 Migration Lane before removing the drugs from the apartment to deliver them to six drug dealers in the Columbus area, among them Jimi Ward and Pablo Pace. Cortez–Torres and yet another co-conspirator, Humberto Brambila–Chavez, also used a second Columbus residence, 6198 Deewood Loop West, to store and package cocaine. Between January and May of 2013, Bucio–Cabrales and Cortez–Torres received and disposed of between one and two hundred pounds of marijuana at the Migration Lane residence each week. They also sold between seven and nine kilograms of cocaine during that time.

In early 2013, Drug Enforcement Administration ("DEA") agents stationed in Columbus received a tip from an informant that Pablo was trafficking in marijuana and cocaine in the area. Agents corroborated the tip with information from DEA agents in California. Working with their informant, agents organized and observed a drug transaction in which the informant purchased marijuana from Pablo, who was driven to the exchange by Bucio–Cabrales. Agents then followed Bucio–Cabrales and Pablo back to 4020 Migration Lane. In the weeks that followed, agents surveilled Bucio–Cabrales, Pablo, and Cortez–Torres, spending considerable time watching 4020 Migration Lane, where they believed Bucio–Cabrales and Cortez–Torres lived. During their surveillance, agents saw Bucio–Cabrales and Cortez–Torres engage in activity indicative of drug trafficking, such as receiving suspicious deliveries at 4020 Migration Lane, transporting unknown vehicles to the apartment before loading them and returning them to parking lots, repeatedly switching rental cars, and delivering items during short meetings at residences and shopping centers.

Based on information gathered during this surveillance, as well as on agents' observations of Cortez–Torres as he arranged and executed a drug deal with the government's informant on May 8, 2013, DEA agents applied for a warrant to search 4020 Stelzer Road, which they be-

lieved was the correct street address for the apartment at 4020 Migration Lane. The warrant application included an affidavit signed by Agent Anne Durbin, a Franklin County, Ohio, officer assigned to the DEA, in which Agent Durbin detailed her extensive experience in drug investigations. Agent Durbin stated that in her experience, drug traffickers often store the fruits and instrumentalities of their illegal activities in their residences:

> Your Affiant's training and experience ... form the basis of the [following] opinions and conclusions[:] ... That it is common for drug traffickers to maintain multiple premises from which their illegal business is conducted. Drug traffickers also store narcotics, narcotics proceeds and records relating to the trafficking of narcotics at their residences.... That persons involved in large scale drug trafficking conceal within their residence ... caches of drugs, large amounts of currency ... and/or proceeds of drug sales....

In addition, the warrant affidavit stated that "6198 Deewood Loop West Columbus, Ohio and [4020 [1]] Stelzer Rd Columbus, Ohio have been identified as locations associated with the storage and/or distribution or frequented associates [sic] by members of a large-scale trafficking organization being investigated by DEA Columbus and the Franklin County Drug Task Force," and recounted the following events involving "a male Hispanic," later identified as Cortez–Torres, on May 8, 2013:

> On May 08, 2013 agents were contacted by a [confidential source ("CS")] who informed agents that he/she had received a call from a male Hispanic requesting to meet the CS at the Home Depot on Brice Rd. North of IS70.

Agents monitored a call back to the male Hispanic by the CS. It was determined that this male Hispanic was a member of a [drug-trafficking organization ("DTO")] that the agents had been investigating since December 2012.

During this call the CS agreed to meet with the male Hispanic at the Home Depot lot.... Agents monitored the meet.... During this meet agents positively identified the male Hispanic as a facilitator within the DTO the agents had been investigating. The male Hispanic told the CS that [he] had ten kilograms of cocaine which needed to be sold within five days. The male Hispanic then in substance asked the CS if the CS could take some of the kilograms within the next hour.

Following this meet, surveillance followed the male Hispanic to the address of 6198 Deewood Loop West. Surveillance observed the same male Hispanic from the meet, exit the front door of 6198 Deewood Loop West. At this time the male Hispanic placed a call to the CS stating that he "had it" and that the male Hispanic did not want to return to his house with "it." The CS stated that the CS could not meet for an hour.

Surveillance units continued to observe the male Hispanic and observe him park and enter the address of 4020 Stelzer Rd. For months agents have observed male Hispanic utilize this residence and believe this to be his permanent residence.

Agents had the CS contact the male Hispanic and confirm [he] was en route to the predetermined meet location.... Surveillance units observed the male Hispanic leave the residence of 4020

---

1. The quoted sentence contained a typographical error that transposed the digits of the

Stelzer Road address.

Stelzer Rd and go directly to meet the CS.

Agents observed and monitored the meet between the CS and the male Hispanic. The male Hispanic got out of his vehicle and entered the CS vehicle. The male Hispanic had a kilogram of cocaine tucked in the waistband of his pants and under his shirt. When the male Hispanic got into the CS vehicle the male Hispanic handed the kilogram of cocaine to the CS. The CS agreed to pay the male Hispanic by 7:00 pm ... and requested that [he] bring the CS two additional kilograms of cocaine at that time. The male Hispanic agreed. ...

Surveillance units observed the male Hispanic leave the meet location and drive directly back to the address of 6198 Deewood Loop West. A short time later, surveillance units observed the male Hispanic leave the address of 6198 Deewood Loop West. The male Hispanic then returned to his address of 4020 Stelzer Rd.

Surveillance units have continued to monitor the activities of the male Hispanic and believe his pattern of activity is consistent with drug trafficking; meeting individuals in parking lots for brief periods of time, driving in a pattern with no purposeful route from one residence to another only to stay a brief time at the residence, and arriving at residences that have been determined to be involved in this investigation where surveillance observed a brief meet and exchange between the male Hispanic and other individuals yet to be identified.

Through a combination of physical surveillance and historical information derived from the GPS tracking devices and other electronic surveillance, 6198 Deewood Loop West Columbus, Ohio and 4020 Stelzer Rd. Columbus, Ohio have been identified as probable locations where agents believe there is a direct nexus to this male Hispanic and cocaine distribution.

After considering the application and affidavit, the magistrate judge issued a warrant authorizing the search of "4020 Stelzer Road Columbus, Ohio."

Both the warrant application and the warrant listed 4020 Stelzer Road, not 4020 Migration Lane, as the place to be searched because agents mistakenly believed that the address of the apartment at 4020 Migration Lane was 4020 Stelzer Road. The confusion arose because Bucio–Cabrales's apartment, which is located between the two streets, faces Stelzer Road and not Migration Lane. As Agent Durbin would later explain at trial, the front door of the residence, which bears the numerals "4020," opens onto Stelzer Road:

AGENT DURBIN: I'm sorry [for the confusion]. The front door faces Stelzer Road, so this gives the appearance, because it's the front door, that it would be Stelzer. If you enter right here in the picture, you go back—you go back a side street and it's called Migration Lane. And there is [sic] apartments behind [4020 Migration Lane]. Those apartments face other streets or, specifically, even, Migration Lane.

Although Agent Durbin's warrant application listed the wrong street address, it did accurately describe the building located at 4020 Migration Lane, which it represented as a "[s]ingle family, two-story residence located within a multi-family townhouse complex with tan brick and tan siding; with the numerals '4020' affixed to a black entrance door; located at 4020 Stelzer Road, Columbus, Ohio." The warrant included a nearly identical description.

DEA agents, among them Agent Durbin and Special Agent Michael Eichenlaub, both of whom had participated in the sur-

veillance of 4020 Migration Lane, executed the search warrant at the address. The search turned up bales of marijuana together weighing approximately two hundred pounds, a small amount of cocaine, two firearms, materials used for packaging cocaine and marijuana, drug ledgers, a calculator, and $16,000 in cash. Of this material, the drug ledgers, currency, packaging material, and one firearm were recovered from Bucio–Cabrales's bedroom and attached bathroom, where officers also found Bucio–Cabrales's clothes, receipts bearing his name, and his identification card. The other gun was found between a mattress and box spring in the room occupied by Cortez–Torres, who later told police that Bucio–Cabrales had provided him with funds to purchase the weapon. Officers also executed a search warrant at 6198 Deewood Loop West, where they found cocaine wrappers, a cocaine press, and a scale dirtied with white powder.

### B

One month after the searches, a federal grand jury indicted Bucio–Cabrales on charges of conspiring to possess with the intent to distribute cocaine and conspiring to distribute at least 1,000 kilograms of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Bucio–Cabrales elected to have his case tried before a jury and moved to suppress evidence seized from 4020 Migration Lane on the ground that the warrant failed to meet the particularity requirement of the Warrant Clause of the Fourth Amendment. Bucio–Cabrales also requested a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), to determine whether Agent Durbin's warrant affidavit contained perjured statements since it attested to events allegedly observed at 4020 Stelzer Road, not 4020 Migration Lane. The district court denied Bucio–Cabrales's motion and request.

Bucio–Cabrales proceeded to a three-day jury trial, at which the government introduced evidence that Bucio–Cabrales and Cortez–Torres were both runners in the drug conspiracy headed by Pablo, and that Bucio–Cabrales managed Cortez–Torres and the finances of the conspiracy whenever Pablo was absent from Columbus. The jury found Bucio–Cabrales guilty of both counts charged.

After the jury returned its verdict, the probation officer prepared a pre-sentence investigation report, which recounted that officers had discovered two firearms—one in each bedroom—during their search of 4020 Migration Lane. The report stated that "Cortes–Torres [sic] provided to law enforcement that Danny Bucio–Cabrales gave him money to purchase [his] weapon" and also summarized Cortez–Torres's testimony that he answered to Bucio–Cabrales when Pablo was absent from Columbus and that Bucio–Cabrales had a role in managing the conspiracy's finances. On the basis of these facts, the report proposed a two-level sentence enhancement under USSG § 3B1.1(c) for Bucio–Cabrales's role as an "organizer, leader, manager, or supervisor" in the conspiracy and another two-level enhancement pursuant to USSG § 2D1.1(b)(1) for possessing a dangerous weapon during relevant conduct. Over Bucio–Cabrales's objections, the district court agreed with the pre-sentence report, but the court then imposed a below-guidelines sentence of 144 months in prison.

Bucio–Cabrales timely appealed and now raises three arguments for why the warrant that authorized the search of 4020 Migration Lane was defective. Because the district court admitted evidence obtained during the search, Bucio–Cabrales argues that the deficiencies in the warrant require this court to reverse his convic-

tions and remand for a *Franks* hearing. Even if he is not entitled to this relief, Bucio–Cabrales argues that we must vacate his sentence because the government set forth insufficient evidence to support the two sentence enhancements that he received. We address each of the three alleged deficiencies in the warrant before turning to the two sentencing issues implicated in this appeal.

## II

Bucio–Cabrales raises three arguments for why the warrant that authorized agents to search 4020 Migration Lane was defective. First, Bucio–Cabrales alleges that Agent Durbin's warrant affidavit contained false statements. Appellant Br. 15. Second, he argues that the government's search warrant did not satisfy the particularity requirement of the Fourth Amendment. *Id.* at 16, 22–24. Third, he raises a new claim that Agent Durbin's warrant affidavit failed to establish probable cause because it did not establish a nexus between illegal drug activity and 4020 Migration Lane. *Id.* at 25. For these three reasons, Bucio–Cabrales requests this court to reverse his conviction and remand this case for a *Franks* hearing. *Id.* at 24, 39. As we explain, however, there was no constitutional infirmity in his convictions.

## A

In *Franks*, the Supreme Court held that the Fourth Amendment guarantees criminal defendants the right to a hearing to challenge the validity of a warrant affidavit. *Franks*, 438 U.S. at 171–72, 98 S.Ct. 2674. However, in order to overcome the "presumption of validity" accorded to warrant affidavits, *ibid.*, a defendant must first satisfy two requirements: First, the defendant must make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reck-less disregard for the truth, was included by the affiant in the warrant affidavit." *Id.* at 155–56, 98 S.Ct. 2674. Second, he must also show that the allegedly false statement is "necessary to the finding of probable cause." *Id.* at 156, 98 S.Ct. 2674. When reviewing a district court's denial of a *Franks* hearing, we review the district court's factual findings for clear error and its conclusions of law de novo. *United States v. Graham*, 275 F.3d 490, 505 (6th Cir.2001).

In support of his motion for a *Franks* hearing, Bucio–Cabrales argued to the district court that Agent Durbin's supporting affidavit for an application to search his residence was defective because it specified the wrong address. As the language from *Franks's* first requirement suggests, however, the defendant has the burden to show not only a false statement in a warrant affidavit, but also knowledge of the statement's falsity or, at the very least, "reckless disregard for the truth" on the part of the affiant. *United States v. Mastromatteo*, 538 F.3d 535, 545 (6th Cir.2008). Where the defendant does no more than allege that an affiant made false statements, the defendant is not entitled to a hearing. *See, e.g., United States v. Poulsen*, 655 F.3d 492, 505 (6th Cir.2011). In this case, the district court denied Bucio–Cabrales's motion on the ground that he failed to supplement his bare allegations of a false statement with any evidence that Agent Durbin acted "knowingly or intentionally, or with reckless disregard for the truth." We agree. Because Bucio–Cabrales failed to produce any evidence that would satisfy the burden required for a *Franks* hearing, the district court did not err when it denied Bucio–Cabrales's motion.

In his appellate brief, Bucio–Cabrales seeks to remedy the deficiency in his trial-court motion by adding an allegation that

Agent Durbin's failure to provide the correct address for the property located at 4020 Migration Lane in her affidavit amounted to reckless disregard for the truth. Appellant Br. 24. On his view, agents should have known better than to believe that his residence was located at 4020 Stelzer Road: "It seems clear that agents, despite months of alleged surveillance of [4020 Migration Lane], never even read the street signs." *Ibid.* For Bucio–Cabrales, this mistake reflects a great oversight that obviously "exhibited a reckless disregard for the truth." *Ibid.* Apparently because the district court should have recognized this error, Bucio–Cabrales argues that he now has a right to a *Franks* hearing. *Ibid.*

Because Bucio–Cabrales never raised this argument in the district court, our consideration of it is limited to reviewing for plain error. *See* Fed.R.Crim.P. 12(b), 52(b); *United States v. Lopez–Medina,* 461 F.3d 724, 739 (6th Cir.2006) ("[W]e have applied Rule 52(b)'s plain error review to new suppression arguments raised for the first time on appeal after a defendant's original suppression arguments proved unsuccessful at the trial court level."). We use the plain-error doctrine sparingly, "only in exceptional circumstances, and solely to avoid a miscarriage of justice." *United States v. Critton,* 43 F.3d 1089, 1094 (6th Cir.1995) (quoting *United States v. Cox,* 957 F.2d 264, 267 (6th Cir.1992) (per curiam)). An error is plain only when "it is obvious, affects substantial rights, and seriously affects the fairness or integrity of judicial proceedings." *Lopez–Medina,* 461 F.3d at 739.

■ Bucio–Cabrales cannot meet this standard for the simple reason that the confusion over his former address is obviously understandable: As we have explained, 4020 Migration Lane, which bears the numbers "4020" on the front door, squarely faces Stelzer Road, not Migration Lane. In Agent Durbin's words, "[t]he front door [to 4020 Migration Lane] faces Stelzer Road, so this gives the appearance, because it's the front door, that it would be Stelzer."

A "defendant who challenges the veracity of statements made in an affidavit that formed the basis for a warrant has a heavy burden," *United States v. Bennett,* 905 F.2d 931, 934 (6th Cir.1990), and "*Franks* specifically states that '[a]llegations of negligence or innocent mistake are insufficient,'" *United States v. Palmer,* 27 Fed. Appx. 343, 350 (6th Cir.2001) (per curiam) (alteration in original) (quoting *Franks,* 438 U.S. at 171, 98 S.Ct. 2674). Agent Durbin's trial testimony and the exhibits submitted by the government show how someone standing on Stelzer Road, looking at a street-facing front door with the numerals "4020," would reasonably conclude that the apartment's address was 4020 Stelzer Road. Accordingly, we conclude that Bucio–Cabrales has failed to show that he was entitled to a *Franks* hearing.

**B**

The Warrant Clause of the Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV (emphasis added). "[A] search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional," *Massachusetts v. Sheppard,* 468 U.S. 981, 988 n. 5, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984), which may in some circumstances require a court to suppress evidence seized during the search, *see United States v. Leon,* 468 U.S. 897, 923, 104 S.Ct. 3430, 82 L.Ed.2d 677 (1984). We review de novo a district court's con-

clusion as to whether a search warrant describes the premises to be searched with sufficient particularity. *United States v. Gahagan*, 865 F.2d 1490, 1496 (6th Cir. 1989).

In his motion to suppress, Bucio–Cabrales argued that the search warrant for 4020 Migration Lane failed to "describe with 'particular[ity] ... the place to be searched and the persons or things to be seized.'" Invoking *United States v. Durk*, 149 F.3d 464 (6th Cir.1998), Bucio–Cabrales observed that the "test for determining whether a search warrant describes the premises to be searched with sufficient particularity is ... whether the description is sufficient to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premises might be mistakenly searched." He argued that because the search warrant authorized a search of 4020 Stelzer Road, another Columbus address located far from 4020 Migration Lane, agents' execution of the warrant at 4020 Migration Lane ran afoul of *Durk* and violated the Fourth Amendment. Bucio–Cabrales appears to renew the same argument on appeal.

Although Bucio–Cabrales identifies the appropriate "test for determining whether a search warrant" satisfies the particularity requirement, *Durk*, 149 F.3d at 465, the mistake that he complains of does not rise to a level of constitutional magnitude. *Durk* is instructive. In that case, officers obtained a warrant authorizing a search of "4612 Fulton." *Ibid.* According to the warrant, "4612 Fulton" was on the north side of the street and "3 houses to the east of Grandview with the numbers 4612 affixed near the front door." *Ibid.* The warrant also described a "metal storage shed behind the home on [the] north side." *Ibid.* Michael Durk, however, lived not at 4612 Fulton, but at 4216 Fulton, which was

in fact three houses to the *west* of Grandview Road. *Ibid.* We found no constitutional violation, reasoning that the warrant, which described "a more unusual feature: a ten by fifteen foot metal storage shed, the entrance of which is secured by a plastic tie," enabled the officers to locate and identify Durk's residence. *Id.* at 466. And because the executing officer was also the affiant who had just come from Durk's home, "additional circumstances" minimized the risk that the inaccuracies would lead to the search of some other premises. *Ibid.*

■ In this case, where the only alleged error is in the name of the street, the government's warrant is even less susceptible to misconstruction than the warrant at issue in *Durk*, which not only got the address wrong, but also jumbled the house's directional relationship to a landmark, Grandview Road. The warrant for Bucio–Cabrales's home authorized a search of a "[s]ingle-family, two-story residence with tan brick and tan siding" located off of Stelzer Road. Bucio–Cabrales alleges no deficiency in this description, which, as in *Durk*, fairly describes the physical exterior of the premises. And, like the metal storage shed on Durk's property, Bucio–Cabrales's residence bears an unmistakable feature that is not shared by the surrounding apartments or the property at 4020 Stelzer Road, namely, the "numerals '4020' affixed on [a] black entrance door." Moreover, there was no danger that agents would search the wrong location, since, as Bucio–Cabrales puts it, 4020 Stelzer Road is "readily distinguishable" from the apartment that agents surveilled and searched: "one [is] a residence and the other a busy street corner on a commercial thoroughfare." Appellant Br. 19. And, as in *Durk*, "additional circumstances make clear that the inaccuracies in the warrant here would not

lead to a mistaken search of other premises," *Durk*, 149 F.3d at 466: Agents Durbin and Eichenlaub, who executed the warrant, knew exactly which property to search because both had surveilled Bucio–Cabrales's residence in the past.

On these facts, the description in the warrant was sufficient "to enable the executing officer to locate and identify the premises with reasonable effort" and left no "reasonable probability that another premises might be mistakenly searched." *Id.* at 465 (quoting *Gahagan*, 865 F.2d at 1496). Having satisfied these requirements, the warrant was not defective for want of particularity.

C

On appeal, Bucio–Cabrales argues for the first time that the warrant used to search 4020 Migration Lane was defective because the "four corners of the search warrant application did not establish probable cause." Appellant Br. 25. He also argues that the "good-faith" exception to the exclusionary rule, *see Leon*, 468 U.S. at 922–23, 104 S.Ct. 3430, does not apply in this case. Because Bucio–Cabrales did not make this argument in the district court, we may only review for plain error. *See Lopez–Medina*, 461 F.3d at 739. No error, let alone plain error, exists in this case because the warrant affidavit established probable cause.

This court has rejected the proposition that "probable cause to arrest a person for a crime ... [may] automatically give police probable cause to search his residence or other area in which he has been observed for evidence of that crime." *United States v. Savoca*, 739 F.2d 220, 224 (6th Cir.1984). In recognition of that holding, we have developed a requirement that warrant applications must show some "nexus between the place to be searched and the evidence sought." *United States v. Van Shutters*,

163 F.3d 331, 336–37 (6th Cir.1998) (quoting *United States v. Alix*, 86 F.3d 429, 435 (5th Cir.1996)); *accord United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir.2004) (en banc). This nexus, Bucio–Cabrales argues, appears nowhere in Agent Durbin's affidavit.

As Bucio–Cabrales reads the warrant affidavit, the series of events it describes suggests only that Cortez–Torres used 6158 Deewood Loop West for drug trafficking and that he later happened to enter 4020 Migration Lane. Bucio–Cabrales emphasizes that after walking out of the house on Deewood Loop West, Cortez–Torres phoned the government's informant and stated that he "had [the cocaine]" and "did not want to return to his house with it." Appellant Br. 30. To Bucio–Cabrales, this statement "obviously indicated that [Cortez–Torres] had retrieved the cocaine from 6198 Deewood Loop [West]" and that he did not want to go to 4020 Migration Lane with the drugs. *Ibid.* Only when the government's informant delayed the meeting by one hour did Cortez–Torres reluctantly go home to 4020 Migration Lane, a place where the affidavit did not mention drug activity. *Ibid.* Since "[a] suspect's mere presence or arrest at a residence is too insignificant a connection with that residence to establish that relationship necessary to a finding of probable cause," the facts described in the warrant affidavit were not, in his view, sufficient to establish the requisite "nexus." *Id.* at 34 (quoting *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir.2006)).

We disagree. We have consistently held that an application for a warrant authorizing the search of the residence of an individual suspected of drug trafficking need only add to evidence that the individual is a drug trafficker "some reliable evidence" tying the residence to the individual's drug-related activity. *United States v.*

*Gunter,* 266 Fed.Appx. 415, 419 (6th Cir. 2008); *see also McPhearson,* 469 F.3d at 524–25.

■ Even though Cortez–Torres "did not want to return to his house" at 4020 Migration Lane with the cocaine, the warrant affidavit states that he did in fact do so. At the very least, this suggests that Cortez–Torres left the drugs in a vehicle parked in the driveway of 4020 Migration Lane. More likely, since Cortez–Torres was later observed with "a kilogram of cocaine tucked in the waistband of his pants and under his shirt," he took the drugs into the residence. Moreover, after agents observed Cortez–Torres deliver a kilogram of cocaine to the informant, the informant requested that Cortez–Torres deliver two additional kilograms of cocaine by 7:00 pm. Agents then observed Cortez–Torres travel back to 6198 Deewood Loop and then *again to 4020 Migration Lane.* Viewing the evidence, as we must, in the light "most likely to support the decision of the district court," *United States v. Frazier,* 423 F.3d 526, 531 (6th Cir.2005), Cortez–Torres's two visits to 4020 Migration Lane suggest that both times he took drugs inside 4020 Migration Lane or removed drugs from the apartment.

These facts resemble those alleged in the affidavit in *United States v. Gunter,* 266 Fed.Appx. 415 (6th Cir.2008). In *Gunter,* the government's "affidavit describe[d] an incident where law enforcement agents observed Defendant visiting his residence right before he traveled to the site of a drug sale." *Id.* at 419. We found that "[t]his visit provided a neutral magistrate with a substantial basis to conclude that Defendant may have stopped at his residence to pick up some of his merchandise before meeting his customer at another location." *Ibid.*

Of course, in this case Cortez–Torres told the informant that he had drugs in his possession before he entered 4020 Migration Lane and that he did not wish to return to the residence with the drugs. But his statement and expression of intention do nothing to undermine the conclusion that Cortez–Torres carried drugs into 4020 Migration Lane, later returned to 4020 Migration Lane to pick up some or all of the additional two kilograms of cocaine that he promised to deliver to the confidential informant, or left proceeds or records of the drug sale at 4020 Migration Lane. Because the facts alleged in the warrant affidavit provided a basis for the reasonable *inference* that Cortez–Torres was using 4020 Migration Lane in connection with the trade of illegal drugs, Bucio–Cabrales has failed to show any error.

### III

Having ascertained that Bucio–Cabrales's arguments do not warrant reversal of his convictions, we turn to his two arguments for vacating his sentence. Bucio–Cabrales first argues that there was insufficient evidence to support a two-level increase in his offense level for holding a leadership role in the drug conspiracy. He also argues that there was insufficient evidence to support a second two-level increase for his possession of a firearm. Because ample evidence supported both enhancements, we reject both assignments of error.

### A

USSG § 3B1.1(c) provides for a two-level increase in the defendant's offense level if the defendant "was an organizer, leader, manager, or supervisor" in any criminal activity. Although the guidelines do not define the terms "organizer, leader, manager, or supervisor," the comments offer some basic direction: First, the comments state that there can be more than

one person who qualifies as a leader or organizer, suggesting that there may also be more than one person who can play a management or supervisory role. USSG § 3B1.1 comment. (n.4). Second, although the defendant "must have been the … manage[r] or supervisor of one or more participants[,] [a]n upward departure may be warranted … in the case of a defendant who did not … manag[e] or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization." *Id.* comment. (n.2). We have, however, cautioned that "[m]erely playing an essential role" in an offense is not the equivalent of "exercising managerial control over other participants and/or the assets of a criminal enterprise." *United States v. Vandeberg*, 201 F.3d 805, 811 (6th Cir.2000).

Though it is clear that the government bears the burden of proving to the district court that the enhancement applies by a preponderance of the evidence, *United States v. Martinez*, 181 F.3d 794, 797 (6th Cir.1999), we "ha[ve] not settled on the proper standard of review for assessing such enhancements," *United States v. Bell*, 766 F.3d 634, 636 (6th Cir.2014). We need not resolve the question here, since the district court's application of the enhancement was proper in this case even under de novo review.

The district court based its decision to apply the two-level leadership role enhancement on Cortez–Torres's testimony that in Pablo's absence, Bucio–Cabrales directed Cortez–Torres and managed Cortez–Torres's accounts. The court "found Mr. Cortez–Torres to be a credible witness" and relied heavily on Cortez–Torres's testimony that Bucio–Cabrales was second-in-command to Pablo:

> Mr. Cortez–Torres did in fact testify that Mr. Bucio–Cabrales was second-in-command to Pablo. He also testified that whenever Pablo was absent, [Cortez–Torres] … took his marching orders from Mr. Bucio–Cabrales. Mr. Cortez–Torres testified in addition that he turned over all of the proceeds from the narcotics sales to Mr. Bucio–Cabrales; that Mr. Bucio–Cabrales was tasked with accounting, that is, he was in charge of counting the drug proceeds. And Mr. Bucio–Cabrales always returned the drug ledgers after entries were made thereon. Based on the manual, … those acts fit squarely within what would constitute a leadership role.

Bucio–Cabrales argues that the court should not have credited Cortez–Torres's testimony because it was not supported by other evidence at trial. Relatedly, he argues that the court erred in finding that he had authority over Cortez–Torres. Pointing to the court's statement that "Bucio–Cabrales always returned the drug ledgers after entries were made thereon," Bucio–Cabrales also argues that the court erred when it concluded that he had authority over the conspiracy's finances. We find these arguments to be unpersuasive.

Nothing in the record suggests that the district court erred when it concluded that Cortez–Torres testified credibly. Cortez–Torres did not contradict himself at trial, nor did Bucio–Cabrales's counsel impeach him. Moreover, the government introduced evidence that corroborated Cortez–Torres's testimony that Bucio–Cabrales played a supervisory role in the drug conspiracy by directing Cortez–Torres and managing his accounts.

First, the government introduced testimony that showed that Bucio–Cabrales had a relatively senior position in the drug conspiracy. Agent Durbin testified that she often called Bucio–Cabrales "target two because he was kind of second in charge." In her experience, the "upper

person" in a drug organization sits as a passenger while the inferior member drives. Agent Durbin, Agent Eichenlaub, Pace, and Ward all testified that Cortez–Torres chauffeured Bucio–Cabrales. By contrast, when Bucio–Cabrales and Pablo—the undisputed leader of the organization—drove together, Bucio–Cabrales would drive.

Second, other evidence corroborated Cortez–Torres's claim that Bucio–Cabrales was responsible for overseeing Cortez–Torres's accounts. Agents found drug ledgers in Bucio–Cabrales's room and bathroom, along with two thousand dollars in cash and rubber bands used to pack money. This evidence was found alongside clothes that agents had observed Bucio–Cabrales wearing, items that agents had observed Bucio–Cabrales purchase, receipts listing Bucio–Cabrales's alias, and Bucio–Cabrales's Ohio driver's license.

Third, the government did introduce evidence that Pablo had been absent from Columbus at some time between January and May of 2013, giving Bucio–Cabrales an opportunity to oversee and direct Cortez–Torres. Agent Durbin testified that Pablo disappeared from surveillance sometime in March. After this time, Bucio–Cabrales and Cortez–Torres continued to engage in narcotics transactions, giving Bucio–Cabrales ample opportunity to manage Cortez–Torres.

Bucio–Cabrales counters that Ward's and Pace's testimony "barely mentioned Bucio–Cabrales" and focused instead on describing drug deliveries made by Cortez–Torres. Appellant Br. 43. But as the government observes, this testimony could reasonably be viewed as consistent with the conclusion that Bucio–Cabrales occupied a position superior to Cortez–Torres's because "[l]eaders of drug organizations often enlist others to transport drugs and money in order to insulate themselves

from getting caught." Appellee Br. 51. Indeed, the evidence at trial suggested that Pablo, the most senior leader of the conspiracy, was not as involved in day-to-day drug operations as were Cortez–Torres and Bucio–Cabrales. The existence of corroborating evidence, combined with the deference we owe to the district court's credibility determination, points to the conclusion that the court did not err by crediting Cortez–Torres's testimony.

■ In sum, the court's conclusion that Bucio–Cabrales played a supervisory role in the conspiracy is supported by ample evidence from multiple witnesses, among them Cortez–Torres. Cortez–Torres testified that Bucio–Cabrales was "the second guy after Pablo"; that Bucio–Cabrales introduced him to the drug organization; that he answered directly to Bucio–Cabrales; and that he turned over all proceeds from his drug sales to Pablo and Bucio–Cabrales. The government also introduced evidence that Bucio–Cabrales retained the conspiracy's ledgers. The supervisory role enhancement requires only proof of control over another individual in the conspiracy or an instrumentality or assets of the conspiracy, which Cortez–Torres's testimony and other evidence at trial amply supports. Because the district court was entitled to credit Cortez–Torres's testimony, the court properly applied the role enhancement.

It is true that the district court stated that "Bucio–Cabrales always returned the drug ledgers after entries were made thereon." However, as Bucio–Cabrales himself admits, this statement is obviously inconsistent with the evidence heard by the court. Because the court's statement contradicts this evidence, the rest of the court's explanation of its ruling on the role enhancement, and the court's conclusion about Bucio–Cabrales's involvement in the conspiracy, it is clear that the court simply

misspoke when it used Bucio–Cabrales's last name instead of Cortez–Torres's.

### B

USSG § 2D1.1(b)(1) provides that a defendant convicted of a drug offense is eligible for a two-level enhancement if "a dangerous weapon (including a firearm) was possessed." For the sentence enhancement to apply, the government must show, by a preponderance of the evidence, that "(1) the defendant actually or constructively 'possessed' the weapon," *United States v. Greeno*, 679 F.3d 510, 514 (6th Cir.2012) (quoting *United States v. Catalan*, 499 F.3d 604, 606 (6th Cir.2007)), and (2) such possession was during "relevant conduct," *ibid.* (quoting *United States v. Faison*, 339 F.3d 518, 520 (6th Cir.2003)). "Relevant conduct" includes any conduct that occurred "during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." USSG § 1B1.3(a)(1)(B). Once the government meets its burden, a rebuttable presumption arises that the weapon was connected to the offense, and the burden shifts to the defendant to show "that it was 'clearly improbable' that the weapon was connected to the offense." *Catalan*, 499 F.3d at 606 (quoting *United States v. Hill*, 79 F.3d 1477, 1485 (6th Cir.1996)).

■ In this case, neither party introduced evidence concerning a firearm at trial. As mentioned above, however, the pre-sentence report recounted that agents found two firearms at 4020 Migration Lane while executing the search warrant on May 8, 2013. According to the report, one weapon was "retrieved from the bedroom occupied by Misael Cortez–Torres [and] was found between the mattress and the box spring.... Cortes–Torres [sic] provided to law enforcement that Danny Bucio–Cabrales gave him money to purchase this

weapon.... With respect to the other weapon, it was recovered from a dresser in the bedroom belonging to Danny Bucio–Cabrales."

Bucio–Cabrales filed a written objection to the pre-sentence report that only complained about Cortez–Torres's testimony that Bucio–Cabrales gave him money to purchase the first firearm, stating that "[t]here is no corroboration from any source supporting [the] allegation." At the sentencing hearing, Bucio–Cabrales's attorney disputed none of the factual statements in the pre-sentence report "[o]ther than what Mr. Cortez–Torres said." The district court then found that Bucio–Cabrales possessed a weapon within the meaning of USSG § 2D1.1(b) on the basis of the second weapon, which officers found in Bucio–Cabrales's bedroom.

Bucio–Cabrales argues that he should not have received the two-level enhancement. He points out that none of the witnesses at trial testified that Bucio–Cabrales had handled, possessed, used, or discussed a firearm at any time during the conspiracy. He also observes that there was no testimony about how the weapon came to be inside the dresser in his bedroom and objects that the court never made any findings as to the type of weapon recovered or the presence of ammunition. He further complains that "[t]he weapon was not found in close proximity to illicit drugs, proceeds, or paraphernalia." Appellant Br. 65. Relying on the comment to USSG § 2D1.1(b)(1), which states that the enhancement should not apply if it is "clearly improbable" that the weapon was connected to the offense—"[f]or example, the enhancement would not be applied if the defendant, arrested at [his] residence, had an unloaded hunting rifle in the closet," USSG § 2D1.1 comment. (n.11(A))—Bucio-Cabrales concludes that the record provides insufficient evidence to

support the application of a two-level enhancement.

Bucio–Cabrales failed to object to the pre-sentence report's assertion that agents found a weapon in a dresser in his bedroom. Because a failure to object to a pre-sentence report constitutes an admission, *see United States v. Adkins*, 429 F.3d 631, 632–33 (6th Cir.2005), he has admitted that fact. Bucio–Cabrales also did not argue that the gun in his bedroom alone would be insufficient to support a two-level enhancement under USSG § 2D1.1(b)(1). His only objection focused on rebutting the government's accusation that Bucio–Cabrales had provided Cortez–Torres with funds to purchase the *first* gun, which was found in Cortez–Torres's bedroom. In short, Bucio–Cabrales raised no argument that contradicted the pre-sentence report's conclusion—or the court's determination—that Bucio–Cabrales possessed a gun in his bedroom that was sufficient to support a two-level enhancement under USSG § 2D1.1(b). Accordingly, we can only review for plain error his new argument that the record provided insufficient evidence to support the enhancement on this basis. *See United States v. Whited*, 473 F.3d 296, 299 (6th Cir.2007).

In this case, the district court did not plainly err in concluding that the government presented sufficient evidence to meet its initial burdens. As to the first burden, the pre-sentence report, which Bucio–Cabrales accepted in relevant part, states that the weapon was recovered from a dresser in Bucio–Cabrales's bedroom. Because the government introduced evidence of receipts bearing Bucio–Cabrales's alias, his Ohio driver's license, clothes that he had worn, and items that he had purchased, all of which were found in the bedroom, the trial record includes ample evidence to suggest that Bucio–Cabrales actively used the bedroom and therefore constructively possessed the weapon stored inside.

As for the second burden, the government introduced sufficient evidence at trial that Bucio–Cabrales and Cortez–Torres used 4020 Migration Lane—where agents found the gun—to unload, store, and package illegal drugs. Moreover, the cash, rubber bands, and ledgers that agents uncovered in his bedroom and attached bathroom strongly imply that Bucio–Cabrales used his bedroom for drug-related activities. The government having shown that he was in possession of a weapon at the scene of the crime, the burden shifted to Bucio–Cabrales to show that it is "clearly improbable" that the weapon was connected to the offense. *See United States v. Sanchez*, 928 F.2d 1450, 1460 (6th Cir. 1991), *abrogated on other grounds by United States v. Jackson–Randolph*, 282 F.3d 369 (6th Cir.2002).

Bucio–Cabrales did not produce any evidence that the firearm was unrelated to his drug-trafficking activities and thus failed to meet his burden. On appeal, he offers only allegations that the government failed to meet *its* burden because it introduced no evidence concerning the type of firearm or the presence of ammunition. But Sixth Circuit precedent only requires the government to show that the defendant possessed a weapon during "relevant conduct": whether the firearm was accompanied by ammunition or was a model that would clearly not be useful in a drug conspiracy are questions that can only be resolved on the basis of evidence set forth by Bucio–Cabrales. *See United States v. Garner*, 940 F.2d 172, 175 (6th Cir.1991). Bucio–Cabrales never offered any such evidence.

Because there was evidence to suggest that Bucio–Cabrales was in possession of a weapon during conduct related to the drug conspiracy, and because Bucio–Cabrales

failed to rebut the presumption that USSG § 2D1.1(b)(1) applied, the district court's application of a two-level enhancement under § 2D1.1(b)(1) was not plain error.

IV

Bucio–Cabrales has shown no error in the warrant that authorized the search of his residence. Similarly, he has not shown that the district court improperly applied two two-level sentence enhancements.

For these reasons, we find no infirmity in Bucio–Cabrales's convictions or sentence and AFFIRM the judgment of the district court.